LUDE PATTISON STRIKER *v.* ROY TAKEO NAKAMURA.

No. 4618.

OCTOBER 21, 1968.

RICHARDSON, C.J., MARUMOTO, ABE, JJ.,
CIRCUIT JUDGE KING IN PLACE OF LEVINSON, J.,
DISQUALIFIED, AND CIRCUIT JUDGE MONDEN
ASSIGNED BY REASON OF VACANCY.

OPINION OF THE COURT BY ABE, J.

This suit was brought by Lude Pattison Striker, plaintiff, against Roy Takeo Nakamura, defendant, to recover damages for personal injuries and damage to her automobile.

On December 13, 1962, while plaintiff was driving along Ala Moana Boulevard toward Waikiki, defendant crossed over the white dividing line into plaintiff's lane. Defendant testified that he did not see plaintiff's car in the next lane before attempting to change lanes.

Plaintiff testified that to avoid a collision she stepped on her brakes and swerved her car to the right causing it to go over the curb onto the sidewalk and collide with a utility pole. There was no collision between the two cars.

After the accident plaintiff visited her physician, Dr. Wakatake, and complained of a headache, shoulder ache and neck stiffness. About two months thereafter, while she was still under Dr. Wakatake's care, plaintiff became aware of the absence of her regular menstrual flow. She testified that she had been in good health prior to the accident and that her menstrual periods were regular.

Dr. Wakatake testified that plaintiff had suffered a whiplash; that plaintiff was too young for her regular menopause; and that in his opinion the cessation of menses was caused by the accident trauma.

Plaintiff stated that as she continued to have pains in the neck and suffered headaches, and on the advice of a friend, on January 10, 1963 she saw Dr. Richard Dodge, an orthopedic surgeon. While plaintiff was under Dr. Dodge's care, he prescribed heat therapy and the wearing of a cervical collar.

On September 15, 1965, Dr. Dodge referred plaintiff to Dr. Bennett, a neurosurgeon, and to Dr. Henry, a radiologist, because she still complained of neck pains and headaches.

The defendant conceded to the reasonableness of medical expenses totalling $540.91 and bills, checks, etc., were introduced into evidence without any objection. In addition to these medical expenses, plaintiff incurred damages to her automobile in the sum of $107.73.

After trial, the jury returned a verdict for the plaintiff for the sum of $307.73. Plaintiff filed this appeal from a final judgment on the verdict and an order denying a motion for a new trial on the issue of damages.

## I.

It is plaintiff's contention that the trial judge erred when he refused to instruct the jury to take into consideration the early beginning of the menopause, if probably induced by trauma resulting from defendant's negligence, as an element of damages.

The trial judge's instruction on this point was "In determining the amount of damage, if any, to which plaintiff may be entitled herein, you may not take into consideration any pain and suffering caused solely by her menopause."

Plaintiff had requested the court to amend that instruction by adding the words "but you are entitled to consider as one of the elements of damages the early beginning of the menopause, if any, and its mental and physical effect on her by reason of its early beginning."

Dr. Wakatake had testified that accident trauma was the cause of the cessation of menstruation[1] and we agree with plaintiff that in light of Dr. Wakatake's testimony, plaintiff was entitled to an instruction as to the effect of early beginning of the menopause on her mental and physical well being as an element of damages. *Brandt* v. *Mansfield Rapid Transit, Inc.,* 153 Ohio 429, 92 N.E.2d 1 (1950).

## II.

Plaintiff also contends that the verdict in her favor for the

---

[1]"Q Did you at that time have any professional opinion as to whether this cessation of menses was a natural menopause, or a menopause induced by trauma or other cause?

"A I think from experience it's menopause caused by accident trauma.

"Q That was your opinion . . . .

"A (Interposing) That's my opinion.

"Q . . . . about that time?

"A That's right.

"Q How medically would trauma — if you can explain to the Jury what the word 'trauma' is first, what do we mean by the word 'trauma'?

"A Well, trauma could be either physical or mental, like accident, auto accident, is physical, mental accident would be worry, death in the family, or injury to any members of the family.

"Q As an expert in this field, is it possible for menopause to be brought on prematurely, either by trauma of shock, or by great emotional strain?

"A I think in this case it was trauma."

sum of $307.73 was so grossly inadequate that the trial judge erred in denying plaintiff's motion for a new trial only on the issue of damages.

At the trial, plaintiff proved that she incurred medical expenses totalling $540.91 and suffered damage to her automobile in the sum of $107.73. It was not disputed that plaintiff incurred expenses and suffered damages totalling $648.64. Therefore, it must be concluded that the verdict is inadequate.

The issue squarely before us is whether we are powerless to correct a miscarriage of justice, when the trial court by denying a motion for a new trial has failed to do so.

It is our conclusion that the verdict of the jury was grossly inadequate and as stated in *Reisberg* v. *Walters*, 111 F.2d 595 (6th Cir. 1940) at 598, ". . . it demonstrates failure to consider essential elements of damage or damages in amount conceded to have been suffered; that it demonstrates failure to abide by the instructions of the court and an improper compromise between liability and compensation. This being so, there was error of law in overruling the motion for a new trial. . . ."

Plaintiff's motion for a new trial only on the issue of damages was denied by the trial judge and she is contending that this court should reverse the order of the trial judge and grant a new trial only on the issue of damages. There is no question that plaintiff is entitled to a new trial upon that issue, but the question of limiting the new trial to that issue alone is a very serious one.

When the jury returned a verdict in favor of the plaintiff, the jury, in effect, found the defendant guilty of negligence and the plaintiff free from contributory negligence. However, the jury's verdict in the sum of $307.73, which does not fully compensate plaintiff for proven special damages, is grossly inadequate and we believe it raises the question whether to reach an agreement the verdict was the result of an improper compromise made by each of two opposing factions of the jury, one which conscientiously believed that the defendant should prevail in the action and the other equally conscientious in the opinion that plaintiff should recover damages commensurate with the injuries sustained by her.

Because of this uncertainty and the fact that something other than the evidence of damages must have influenced the jury to return such a low verdict for the plaintiff, we must infer that the verdict does not represent a fair estimate of plaintiff's loss, but may represent a difference of opinion among the jurors as to the defendant's liability and a compromise of the controversy at the expense of both litigants. *Southern Ry.* v. *Madden,* 224 F.2d 320 (4th Cir. 1955) ; *Bencich* v. *Market St. Ry.,* 20 Cal. App.2d 518 (1937) ; *Schuerholz* v. *Roach,* 58 F.2d 32 (4th Cir. 1932); *Simmons* v. *Fish,* 210 Mass. 563, 97 N. E. 102 (1912).

Under the circumstances, we believe that it would work a grave injustice upon the defendant to compel him to a new trial only on the issue of damages and we, therefore, direct that a new trial be granted on all the issues.

### III.

The defendant has filed a cross-appeal contending that the trial judge as a matter of law should have found that plaintiff was guilty of contributory negligence or that plaintiff's negligence was the proximate cause of the injuries and damages she suffered.

Contrary to defendant's contention, there were conflicting testimonies on the issue of proximate cause of the injuries. It is the law in Hawaii that questions concerning credibility of witnesses and the weight of evidence are for the jury alone to decide and may not be reviewed by this court on appeal and where the verdict is supported by substantial evidence, more than a mere scintilla, the verdict will not be set aside. *Reynolds* v. *Van Culin,* 36 Haw. 556 (1943) ; *Darcy* v. *Harmon,* 30 Haw. 12 (1927).

Thus, it could be said that the cross-appeal taken by the defendant is without merit, except for the holding of this court under point II of this opinion.

Plaintiff's other specifications of error are without merit.

Reversed and remanded for a new trial on all issues.

*Kenneth E. Young* for appellant, cross-appellee.

*George L. Dyer, Jr.* (*Anderson, Wrenn & Jenks* of counsel) , for appellee, cross-appellant.

DISSENTING OPINION OF MARUMOTO, J.

I dissent from the reversal of the circuit court judgment in this case.

This court based its reversal on two grounds. The first ground is that the court erred in refusing plaintiff's request to append, to the instruction quoted below, additional language to the effect that the jury was entitled to consider, as an element of damages which might be recovered by plaintiff, the early beginning of her menopause and its mental and physical effect upon her.

The instruction, as given by the court, read as follows:

"In determining the amount of damage, if any, to which plaintiff may be entitled herein, you may not take into consideration any pain and suffering caused solely by her menopause."

It was given at defendant's request. As originally worded by defendant, it did not contain the word "solely." That word was inserted at plaintiff's request.

The second ground of reversal is that the verdict of $307.73 is grossly inadequate because it "does not fully compensate plaintiff for proven special damages" amounting to $648.64, of which $107.73 was for damages to her automobile and $504.91 consisted of medical expenses incurred by her after the accident.

With reference to the first ground, the record shows that, before the case was argued to the jury, the court held a conference for the purpose of settling instructions. At that conference, after the wording of the mentioned instruction was settled as stated above, plaintiff's counsel made the following statement:

"MR. YOUNG: Now to make this a complete statement of the law, and to be fair, there should be a sentence added to that:

'You may, however, consider what effect, if any, the premature menopause had upon Plaintiff's physical condition.'

"This would balance it, you see, and give it effect. My whole case is based on the fact that she's had it five years early."

The case was then argued to the jury. At the conclusion of the argument, but before the instruction was given to the jury, there was another conference, at which the following colloquy took place between plaintiff's counsel and the court:

"MR. YOUNG: I object to it, as written, and request to give my reason for it.

"THE COURT: Let me then indicate that I am going to give this over objection by the Plaintiff. In any event now, do you want to state your objections to the Court's giving the Defendant's requested instruction number 50?

"MR. YOUNG: Your Honor, I am requesting that certain words be added, and I'm objecting to it, because these words are not in it:

' * * * but you are entitled to consider as one of the elements of damages the early cessation of menopause, if any.'

"THE COURT: You mean the early beginning of the menopause, not cessation.

"MR. YOUNG: Yes, the early beginning of the menopause, if any, and its mental and physical effect on her by reason of its early beginning.

"THE COURT: Well, that is another matter, which the Court feels does not have to be set forth in this instruction. The Court feels that this instruction is a correct statement of the law, as far as it goes."

Thus, plaintiff did not object to the instruction as containing an erroneous statement of law. The wording of the instruction, as far as it went, was satisfactory to her. Her only objection was that the additional language requested by her was not tacked on to the instruction.

This court holds that plaintiff's request should have been granted in the light of Dr. Wakatake's testimony that accident trauma was the cause of the cessation of menstruation, and cites *Brandt* v. *Mansfield Rapid Transit, Inc.,* 153 Ohio 429, 92 N.E. 2d 1 (1950) as supporting authority.

*Brandt* v. *Mansfield Rapid Transit, Inc.,* is a case in which the appellate court reversed a trial court judgment on the ground

that a verdict should be based on probability and not on mere possibility. The court there stated:

"In the instant case the plaintiff's sole medical evidence as to premature menopause was merely speculative and conjectural and hence could not serve as the basis for a finding rising to the requisite dignity of probability." (153 Ohio 429, 432, 92 N.E. 2d 1, 3).

In this case, plaintiff's counsel propounded the following question to Dr. Wakatake after eliciting his testimony that cessation of plaintiff's menstruation was caused by trauma:

"Q. Would you have an opinion as to whether or not the menses would not have ceased at that time, if it had not been for the accident?"

Dr. Wakatake's answer to the question was: "Well, it's hard to say."

On cross-examination by defendant's counsel, Dr. Wakatake testified as follows:

"Q Doctor, there were no symptoms of menopause before this that Mrs. Striker was going through before this situation, were there?

"A Well, she had some vague symptoms, because of her family trouble at home.

"Q She had vague symptoms of menopause starting, because of the family trouble at home?

"A It's not really menopause. It's more nervousness.

"Q And is that a symptom of oncoming menopause?

"A It could produce — precipitate — early menopause, in some cases.

"Q Well, is it possible, in a case such as this, where you have both the nervous stimulus of trouble at home and you also have an automobile accident of sorts, is it possible for you to divide the causation or differentiate between the two possible causes?

"A It's very difficult.

"Q Wouldn't you say it's likely that the family situation at home was the cause of the oncoming menopause, as much as that of the accident?

"A Well, it's hard to say. I cannot state it.

"Q But could you state that it was more likely that the accident was? You can't differentiate . . . .

"A (Interposing) It's hard to differentiate.

"Q To a reasonable medical certainty you could not differentiate . . . .

"A (Interposing) Could not.

"Q . . . . between them?

"A No."

Further, on recross-examination, he gave the following testimony:

"Q You define trauma as being either an accident, such as this, or a mental or nervous strain?

"A Correct.

"Q So that when you say, trauma could have caused it, it could have been either trauma . . . .

"A (Interposing) Could be.

"Q . . . . or the other?

"A That's correct."

The foregoing testimony shows that when Dr. Wakatake attributed the cessation of plaintiff's menstruation to "trauma," he did not necessarily confine the meaning of that word to the trauma of accident but had in mind also the trauma resulting from mental or nervous strain induced by trouble at home. Plaintiff had seen Dr. Wakatake one month before the accident, at which time she "was very nervous because of her family affairs."

Besides going to Dr. Wakatake, plaintiff consulted Dr. Cushnie on problems relating to menopause, in June 1964, six months after the accident. Dr. Cushnie testified that when he first saw plaintiff, he felt that she was going through menopause; that menopause usually occurs at about age forty-five, but "with regard to an individual, there's no way of telling;" and that he has "had women under the age of forty, thirty-six, thirty-seven, thirty-eight, that have had menopausal symptoms." Plaintiff was thirty-nine years old at the time of the accident.

Dr. Cushnie also declined to commit himself as to the cause

of plaintiff's early menopause. On this point, his testimony was as follows:

"Q * * * Now would you say that premature menopause could begin as a result of severe trauma and emotional disturbance following — is it possible? Is it possible, medically?

"A I wouldn't like to answer that, because that would be a very controversial question.

*     *     *     *

"Q I just want to ask you this. Didn't Mrs. Lude Striker on at least two occasions, or three occasions, when she was concerned with her flow, and when she was concerned with these problems, coming to you for treatment, didn't she ask you, Doctor, on one, or two, or three occasions, whether you yourself could give her any opinion as to why her menopause was taking place at this time, or did you say you didn't have any opinion as to what the cause was.

"A I don't recall. I might have talked to her on that. She might have asked me on that, but I don't recall what I said to her.

"Q You never committed yourself one way or the other. That's the truth, isn't it?

"A That's correct.

"Q Yes.

"A It's hard to do."

I think the court properly refused to append to the instruction either of the additional language requested by plaintiff.

The additional language originally requested, reading: "You may, however consider what effect, if any, the premature menopause had upon Plaintiff's physical condition," assumed that plaintiff suffered a premature menopause and that such result was proximately caused by the accident.

The additional language later requested, that the jury was entitled to consider as one of the elements of damages the early beginning of menopause if any, assumed that if plaintiff suffered a premature menopause, it was a proximate result of the accident.

Under the evidence detailed above, neither the assumption that plaintiff suffered a premature menopause, nor the assump-

tion that premature menopause was proximately caused by the accident, could have been made. Refusal to give an instruction inapplicable to the state of evidence is not error. *Chambers* v. *City and County of Honolulu,* 48 Haw. 539, 543, 406 P.2d 380, 383 (1965).

With regard to the second ground of reversal, the verdict which this court holds to be grossly inadequate must be considered in the light of the following instruction, which was not objected to by plaintiff:

"If you find for the Plaintiff, Lude C. Striker, in arriving at the amount of the award due her *for any injuries proximately and solely caused by the negligence of the Defendant, Roy T. Nakamura,* you should include:

(1) The reasonable value, not exceeding the actual cost of any examinations, attention and care by physicians and surgeons and others, reasonably required and actually given in the treatment of such injury and reasonably required in the future; and

(2) The reasonable value, not exceeding the actual cost of x-ray pictures, medicine and other supplies, if any, reasonably required and actually given in the treatment of such injury or reasonably required in the future; and

(3) Such sum as will compensate the Plaintiff reasonably for any loss of earnings occasioned by such injury; and

(4) A sum which will compensate the Plaintiff reasonably for: (a) any pain, suffering and mental anguish already suffered by her, proximately resulting from such injury; and (b) for such pain, suffering and mental anguish, if any, as she is reasonably certain to suffer therefrom in the future.

Pain and suffering have no market value. They are not capable of being exactly and accurately determined, and there is no fixed rule or standard whereby damages for them can be measured. Hence, the amount of damages to be awarded for them must be left to your judgment, but cannot under the complaint in this case exceed the sum of $100,000.00." (Emphasis supplied)

This instruction is a modification of an instruction requested

by plaintiff, the principal modification being the addition of the words, "for any injuries proximately and solely caused by the negligence of the Defendant, Roy T. Nakamura," emphasized in the quotation. Plaintiff did not object to the modification. As a matter of fact, the instruction was given over defendant's objection, not over that of plaintiff.

There was no clear cut showing that plaintiff's medical expenses of $540.91, in evidence in this case, were incurred for injuries "proximately and solely caused" by defendant's negligence. The medical bills were introduced in evidence without objection by defendant. Defendant conceded the reasonableness of the amounts charged but did not concede that all of the bills were recoverable. On this point the transcript shows the following:

"THE COURT: You're now offering it in evidence, Mr. Young?

"MR. YOUNG: Yes, Your Honor.

"THE COURT: You have no objection to it, Mr. Dyer?

"MR. DYER: We have no objection to it, Your Honor, although we don't stipulate that it's all recoverable or accurate, we . . . .

"MR. YOUNG: (Interposing) We understand that."

Plaintiff did not have any broken bones, lacerations, bruises, or even black and blue marks from the accident. The only part of her automobile that was damaged was the right rear fender, and the accident did not prevent its continued use. She continued to drive it on the day of the accident and on the following day. Plaintiff did not notice any pain immediately after the accident, nor did she suffer any discomfort or pain in the evening, although she was "still shaken up a bit." She testified as follows regarding her condition on the morning after the accident:

"The following morning I got up, and my head felt heavy, and my shoulders and my neck felt as though I had a stiff neck and felt as though I had done some hard labor, or something. It ached all over. I took couple of aspirins, but it was not any painful sensation, but just a full, heavy sensation I had in my head."

These are symptoms of menopause, according to the following

testimony of Dr. Cushnie:

"Q Would you tell us what the symptoms of menopause are?

"A Well, the symptoms of menopause are varied with the different particular emotional, nervous makeup of the individual, physiological makeup. The first symptom we find — not the first, but one of the symptoms is the sensation of weakness, nausea, hot flashes, cold sweats, many times we have an emotional depression.

"Q Doctor, what about headache? Can that be . . . .

"A (Interposing) Yes, headache is very often one of the main symptoms.

"Q How about neck ache?

"A Well, it depends if you have — of the woman's complaining of the menopause and has, more or less of an emotional problem, many times we have the pain starting in the back of the neck, which goes down the back of the neck, or comes up, and that is very common in menopause too."

In the testimony of Dr. Wakatake and Dr. Cushnie, mentioned earlier in this dissent, neither of them made any commitment that plaintiff's menopause was caused by the accident.

Such being the state of evidence, it was for the jury to determine whether plaintiff's medical bills, and her physical complaints, were attributable to injuries proximately and solely caused by defendant's negligence. This court stated in *Vasconcellos* v. *Juarez*, 37 Haw. 364, 366 (1946), that "a finding of an amount of damages is so much within the exclusive province of the jury that it will not be disturbed on appellate review unless palpably not supported by evidence." See, also, *Tsuruoka* v. *Lukens*, 32 Haw. 263, 268 (1932); *Lima* v. *Tomasa*, 42 Haw. 478, 483 (1958); *Johnson* v. *Sartain*, 46 Haw. 112, 114, 375 P.2d 229, 230 (1962). These cases involved appeals in which the verdicts were attacked as being excessive, but the same rules should apply where a challenge is based on the ground of inadequacy. *Mainelli* v. *Haberstroh*, 237 F. Supp. 190, 193 (D.C.M.D. Pa. 1964).

I do not think that the verdict here is palpably unsupported by evidence.