HIROSHI NAKAGAWA *v.* HELEN APANA,
dba MAUI METAL COMPANY.

No. 4944.

NOVEMBER 23, 1970.

RICHARDSON, C.J., ABE, LEVINSON, JJ.,
CIRCUIT JUDGE M. DOI IN PLACE OF MARUMOTO, J.,
DISQUALIFIED AND CIRCUIT JUDGE KABUTAN
IN PLACE OF KOBAYASHI, J., DISQUALIFIED.

380

On October 31, 1967, plaintiff-appellee, Hiroshi Nakagawa, an employee of Johnson Pacific Company (hereinafter referred to as Johnson Pacific), was working on the roof of the Maui Community College Building when he was struck by a bucket of cement. The cement bucket was being lifted to the roof of the building by a crane owned by the defendant-appellant, Helen Apana, and operated by Rusty Apana. His signalman was Joseph Kaiwi. Both Kaiwi and Rusty Apana were employees of the defendant. Suit was filed against the owner of the crane for the negligence of its employees on the theory of *respondeat superior*. The jury found for the plaintiff and awarded damages in the amount of $190,000.

Defendant specifies two points of error. (1) The trial court erred in not granting motions for a directed verdict and for judgment notwithstanding the verdict. The contention is that the evidence was insufficient and required a finding for the defendant on the motion for a directed verdict, and the evidence did not support the verdict of the jury. In arguing for the motions, the defendant claims that the evidence requires a finding that at the time of the accident in which plaintiff was injured, the crane operator and signal man were employees of and under the supervision and control of Johnson Pacific. Such a finding would relieve the defendant of any negligence for which the crane operator or signalman may have been liable. (2) The trial court erred in refusing to consider, on the ground it was untimely, defendant's argument, in support of an amended motion for a new trial, that the verdict was excessive.

## I.

The principal question we address ourselves to on this appeal is whether the evidence was sufficient to support the judge's denial of defendant's motion for a directed verdict and the jury's verdict insofar as it found Kaiwi and Rusty Apana to be the servants of the defendant at the time the negligent act occurred. Essentially, therefore, we have a case dealing with the "loaned servant" doctrine.

There are certain well-settled rules of law applicable to this class of cases.

1. A master is subject to liability for the torts of his servants committed while acting in the scope of their employment. *Matsumura* v. *County of Hawaii*, 19 Haw. 496 (1909); 1 Restatement of Agency 2d § 219.

2. When a master rents the services of an employee for the operation of an instrumentality owned by the master and gives the hirer the power to direct the servant where to go and what to do in the performance of the work without relinquishing to the hirer the power to discharge such servant, the legal presumption is that the servant remains, in the absence of an agreement to the contrary, the servant of the general employer insofar as it concerns the *manner and method of operating the instrumentality*. The negligence of the servant must be held to be that of the owner of the instrumentality. *Billig* v. *Southern Pacific Co.*, 189 Cal. 477, 485, 209 P. 241, 244 (1922).

3. However, the general employer may lend his servant together with an instrumentality in such a manner as to render the person to whom the servant is loaned a special master for this one particular occasion and hence relieve the general employer from liability for the servant's negligence in the operation of the instrumentality. *Burns* v. *Jackson*, 59 Cal. App. 662, 211 P. 821 (1922); *Linstead*

382

v. *Chesapeake & Ohio Ry.*, 276 U.S. 28 (1928) ; *McCollum* v. *Smith*, 339 F.2d 348 (1964) ; 1 Restatement of Agency 2d § 227.

4. But, in order to constitute an employee a loaned servant, it is not essential that the general employer relinquish full control over his employee, or that the special employee be completely subservient to the borrower. While the borrower must possess the power of "authoritative direction and control" over the employee so that his directions will have "the force of a command," this authority need not extend over every incident of an employer-employee relationship, but only over the servant's performance of the particular work in which he is engaged at the time of his negligent act or omission.[1] *McCollum* v. *Smith, supra,* 339 F.2d at 351. And in this regard the United States Supreme Court in the now classic case of *The Standard Oil Co.* v. *Anderson,* 212 U.S. 215 (1909), was careful to distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking. 212 U.S. at 222.

5. Furthermore, in the absence of evidence to the contrary, there is an inference that an employee remains in his general employment so long as by rendering service to another he is performing the business entrusted to him by the general employer. 1 Restatement of Agency 2d § 227, Comment (b). Accordingly, in such a situation, the burden of proof is upon the person seeking to establish that the original service does not continue and that the

---

[1] This so-called "right to control or direction" test probably derives its theoretical basis from the desire to impose liability upon the employer who was in the best position to prevent injury. "Although this may be considered inconsistent with the liability-without-fault nature of *respondeat superior*, the control test has received widespread approval from the courts." Nepstad v. Lambert, 235 Minn. 1, 12, 50 N.W.2d 614, 620 (1951).

person is in fact a loaned servant. *Kiff* v. *Travelers Ins. Co.*, 402 F.2d 129 (5th Cir. 1968).

Applying these rules to the evidence in the record, our problem is this: Is the evidence sufficient to support the conclusion that Joseph Kaiwi and Rusty Apana were in fact servants of the defendant and not loaned servants of Johnson Pacific, at the time the alleged negligent act occurred.

In reviewing the evidence neither the trial court nor this court should direct a verdict or set aside a verdict unless the evidence as a matter of law is insufficient to justify the submission of the case to the jury. In order to sustain this contention it would be necessary to decide that there was no substantial evidence contrary to appellant's position. *Mossman* v. *Sherman*, 34 Haw. 477, 479 (1938); *Apo* v. *Dillingham Investment Corp.*, 50 Haw. 369, 440 P.2d 965 (1968); *Striker* v. *Nakamura*, 50 Haw. 590, 446 P.2d 35 (1968). This, under the evidence before us, we cannot do.

The record contains the following uncontradicted evidence: (1) The defendant was the general employer of Kaiwi and Rusty Apana; (2) Kaiwi and Apana were paid wages by the defendant; (3) the defendant rented two cranes to Johnson Pacific with four employees to operate them, two operators and two signalmen; (5) the defendant's employees maintained and operated the cranes; (6) both Kaiwi and Apana were trained in their particular operations of crane operator and signalman; (7) the training was conducted at defendant's yard and with defendant's equipment; (8) the manner in which Kaiwi and Apana operated the crane was left entirely to them.

Furthermore, the evidence, although contradicted in part, showed: (1) Kaiwi and Rusty Apana were expected to get the concrete up on the roof and to the places in-

dicated by the foreman of Johnson Pacific. The manner in which they operated the crane was left entirely to them. When the foreman indicated he was ready for the next bucket of concrete and where it was to be placed, Kaiwi, the signalman, would give the necessary hand signals to Rusty Apana, the crane operator. At no time did the foreman or other employees of Johnson Pacific control the manner in which the bucket was lifted and lowered to the desired locations. (2) The power to substitute was in the defendant inasmuch as Rusty Apana told Kaiwi immediately following the accident to stay off the roof. (3) The period of employment was short, *i.e.,* they were called in for a one-day pour.

There is an abundance of crane and equipment cases dealing with this particular problem. As mentioned earlier, perhaps the classic case in this area is *The Standard Oil Co.* v. *Anderson, supra,* 212 U.S. 215 (1909). In that case, the plaintiff was employed as a longshoreman by a master stevedore, who, while under contract with the defendant, was engaged in loading a ship. The plaintiff was working in the hold when he was struck by a load of cases containing oil, which was unexpectedly lowered. The steam winch and drum used in raising and lowering the oil were owned by the defendant, but the tackle and ropes were furnished and rigged by the stevedore. The operation of the winch was done by a winchman in the general employ of the defendant under an arrangement whereby the stevedore had agreed to pay the defendant for the use of the winch. The winchman was hired and paid by the defendant who alone had the right to discharge him. The Supreme Court said:

. . . The stevedore had no control over the movements and conduct of the winchman, except as follows: The hours of labor of the winchman necessarily conformed to the hours of labor of the longshoremen. The winch

and winchmen were at a place where it was impossible to determine the proper time for hoisting and lowering the draft of cases of oil, and the winchman necessarily depended upon signals from others. These signals were given by an employe' of the stevedore, called a gangman, who stood upon the deck of the ship and gave signals to hoist or lower by the blowing of a whistle which could be heard for a long distance. The negligence consisted in lowering a draft of cases before receiving this signal. (212 U.S. at 219.)

It is insisted by the defendant that the winchman, though in its general employ, had ceased to be its servant, and had become for the time being, with respect to the work negligently performed, the servant of the master stevedore. This may be true, although the winchman was selected, employed, paid and could be discharged by the defendant. If it is true, the defendant is not liable. The case, therefore, turns upon the decision of the question, Whose servant was the winchman when he was guilty of the negligence which caused the injury? (212 U.S. at 220.)

Much stress is laid upon the fact that the winchman obeyed the signals of the gangman, who represented the master stevedore, in timing the raising and lowering of the cases of oil. But when one large general work is undertaken by different persons, doing distinct parts of the same undertaking, there must be cooperation and coordination, or there will be chaos. The giving of the signals under the circumstances of this case was not the giving of orders, but of information, and the obedience to those signals showed cooperation rather than subordination, and is not enough to show that there has been a change of masters. . . . (212 U.S. at 226.)

The defendant in this case, like the defendant in *Standard Oil,* relies on the fact that the hours of work of the crane operator and signalman necessarily closely conformed to the hours of work of the employees of Johnson Pacific, and upon the fact that employees of Johnson Pacific had to designate where the next load of concrete should be poured. As *Standard Oil* makes clear, neither of these factors is decisive. It should particularly be noted that in the present case the alleged special employer's real employees did much less in the way of giving signals than was present in *Standard Oil.* They indicated to Kaiwi, the signalman, only where the concrete was to be brought, and he, in turn, did the actual guiding of the crane operator, Rusty Apana. The signalman was in the general employ of the defendant, not of Johnson Pacific, Inc. Yet even with the much greater degree of reliance on the signals of the alleged special employer, the Supreme Court in *Standard Oil* held that the general employment had continued.

*See also Peters* v. *United Studios, Inc.,* 98 Cal. App. 373, 277 P. 156 (1929); *Ambrosius Industries* v. *Adams,* 293 S.W.2d 230 (Ky. App. 1956); *Rocky Mt. Trucking Co.* v. *Taylor,* 79 Wyo. 461, 335 P.2d 448 (1959); *Penrose* v. *Mitchell Bros. Crane Div., Inc.,* 246 Ore. 507, 426 P.2d 861 (1967); *Lewis* v. *Barnhill,* 267 N.C. 457, 148 S.E.2d 536 (1966).

Appellant places her principal reliance in urging reversal on *Nepstad* v. *Lambert,* 235 Minn. 1, 50 N.W.2d 614 (1951), and *McCollum* v. *Smith,* 339 F.2d 348 (9th Cir. 1964). In each of these cases, in contrast to ours, the movement of the equipment about the job site was directed and controlled by the general contractor; signals were given to the crane operator by the general contractor's employees; these signals controlled the operation of the crane down to the fine details; and the crane together

with the operator, was retained on the job over a period of time rather than being rented to handle a specific task on a specific day.

Unlike *Nepstad* and *McCollum*, the work being done in the present case was not the precision placement of concrete beams, but rather the dumping of ready-mixed concrete in an area for hand spreading. Thus, in those cases it was necessary for whoever was directing the work to have the blueprints and specifications at hand at all times since the order of the beams and the precision placing of them was of crucial importance. In our case, spreading concrete on a roof is, in contrast, a run-of-the-mill construction operation.

Although it can be argued from the defendant's point of view in this case that there was some evidence which, if believed by the jury, might have sustained a verdict in defendant's favor on the issue of control, we find that from the evidence summarized in this opinion there was substantial evidence supporting plaintiff's position that Johnson Pacific did not control defendant's employees. That being so, the trial court did not err in leaving the determination of the issue of borrowed servant to the jury.

## II.

The second issue we must decide is whether the trial court erred in refusing to consider defendant's argument that the verdict was excessive.

Defendant made a timely motion for judgment notwithstanding verdict or new trial on August 4, 1969, six days after the entry of judgment. One of the grounds stated in support of the motion was that the evidence did not support the verdict. The hearing on this motion was set for August 22, 1969. On August 21, 1969, defendant filed an amended motion for judgment notwithstanding

verdict or new trial, alleging more specifically that the verdict was excessive. At the hearing, the trial court refused to consider defendant's amended motion for judgment notwithstanding verdict or new trial, on the ground that it was too late.

Rule 59(b), Hawaii Rules of Civil Procedure, provides, "A motion for a new trial shall be served not later than ten days after the entry of judgment." The trial court, in refusing to consider defendant's amended motion filed after the ten-day period but before the date set for the hearing, interpreted Rule 59(b) as barring any additional ground set forth in an amended motion after the ten-day period had elapsed. This view is supported by the weight of authority.[2] However, this court feels the better interpretation of Rule 59(b) is the view set forth by Professor Moore in his Federal Practice treatise. He states:

A motion under Rule 59 made within the time prescribed in subdivision (b) suspends the finality of the judgment and tolls the time for taking an appeal. Since, therefore, the finality of the judgment is suspended by the timely motion, the Advisory Committee determined that to permit judicial enlargement of the time for serving affidavits is justified to allow a more perfect consideration of the motion by the court. Consistent with this reasoning, we believe that once the finality of the judgment has been terminated by a timely motion for a new trial, a proper construction of Rule 59 should permit the trial court, in the exercise of a sound judicial discretion, to allow a subsequent amendment of the motion to state additional grounds for the granting of the motion. If the motion to amend

---

2 See Massaro v. United States Lines Co., 198 F.Supp. 845 (E.D. Pa. 1961). *affirmed.* 307 F.2d 299 (3d Cir. 1962) ; McCloskey v. Kane, 285 F.2d 297 (D.C. Cir. 1960) ; Russell v. Monongahela Ry., 262 F.2d 349 (3d Cir. 1958) ; Francis v. Southern Pacific Co., 162 F.2d 813 (10th Cir. 1947), *affirmed,* 333 U.S. 445 (1948).

is made before the 10 day period of Rule 59(a) has run it should normally be allowed as of course. If made thereafter the trial court should determine in its discretion whether it will serve the ends of justice to allow the amendment to be made in the particular case. An important consideration for the court will naturally be to prevent the hearing and determination of the motion to be delayed unnecessarily.* . . .

* Thus, a party should rarely be allowed to amend the motion after there has been a hearing on the motion and the court has taken the question under advisement. On the other hand, there is no reason why a party should not be permitted to amend if this would not unreasonably delay a hearing and the movant shows good reason why he did not state the additional ground in the original motion.

6A J. Moore, Federal Practice ¶ 59.09[2] (2d ed. 1966) & note 4 at 3850.

*See also Alcaro* v. *Jean Jordeau, Inc.,* 6 Fed. Rules Serv. 7b.2, Case 2 (D. N.J. 1942), 3 F.R.D. 61, *rev'd on other grounds,* 138 F.2d 767 (3d Cir. 1943); *Williamson* v. *Williamson Pulp & Paper Co.,* 8 Fed. Rules Serv. 7b.2, Case 1 (M.D. Pa. 1944).

We hold, therefore, that the trial court should have considered defendant's amended motion filed on August 21, 1969, at the hearing held on August 22, 1969 because a party should be permitted to amend his motion if it will not delay the hearing or prejudice the opposing party. Although we cannot see how the hearing of defendant's amended motion would have interfered with the ends of justice and the trial court's refusal may have been an abuse of its discretion, we do not reverse on this ground because it was harmless error.

The general rule of law controlling the question of excessive verdicts is well settled in this jurisdiction. In *Ginoza* v. *Takai Elec. Co.,* 40 Haw. 691 (1955), this court, quoting from *Vasconcellos* v. *Juarez,* 37 Haw. 364, 365-66, stated:

". . . a finding of an amount of damages is so much within the exclusive province of the jury that it will not be disturbed on appellate review unless palpably not supported by the evidence, or so excessive and outrageous when considered with the circumstances of the case as to demonstrate that the jury in assessing damages acted against rules of law or suffered their passions or prejudices to mislead them.

"The power of this court to disturb a verdict on the ground of excessive damages is one which should be exercised with great caution and discretion, the duty of guarding against excessive verdicts necessarily resting to a large extent with the trial judge and a reviewing court giving great weight to the trial judge's approval of the verdict. Consequently, it ordinarily will not do so where, as here, the trial judge has tacitly approved the verdict as not being excessive and no charge is made of abuse of judicial discretion. Nor will it do so where, as in this case, the record shows (1) that presumably the issue of damages was fairly presented under proper instructions, there being an absence of anything to the contrary; (2) that although the evidence on such issue is in conflict, the appellant does not contend, except by implication, that no part thereof sustains the verdict nor that the conflict may not be determined in support thereof; and (3) that such amount of damages awarded is concededly within the allegations of the complaint." (*Ginoza* v. *Takai Elec. Co., supra* at 704-05.)

*See also Pooler* v. *Stewarts' Pharmacies, Ltd.,* 42 Haw. 618 (1958).

The record shows that the evidence before the jury indicated medical expenses of $1,837.27; lost wages to the date of trial of $17,340; and lost wages during the work

life expectancy of the plaintiff from the date of trial forward of $226,234.20. Moreover, based on the testimony of plaintiff's employer, the wage loss does not add an additional 24 per cent conversion for fringe benefits. The total wage loss, past and future, was $243,366.20. The 24 per cent fringe benefits added thereto would bring the figure to $301,774.09; and if the medical expenses of $1,837.27 were added, the total figure would be $303,611.36, before adding anything for pain and suffering.

Defendant argues that, because there was testimony that plaintiff on several occasions helped unload buckets of fish weighing up to 122 pounds from a tuna boat, it is obvious that he was capable of doing some heavy manual labor and could be engaged in a useful occupation. However, there was testimony by the treating physician that in his opinion the plaintiff would never be able to return to do heavy manual labor whether or not he undergoes surgery. Any determination of this apparent conflict is strictly within the province of the jury. The damages awarded under the circumstances of this case were neither excessive nor outrageous and were fully supported by the evidence.

Affirmed.

*Richard E. Stifel* (*George R. Ariyoshi* with him on the briefs, *Jenks, Kidwell, Goodsill & Anderson* of counsel) for appellant.

*Frank D. Padgett* (*Padgett, Greeley, Marumoto & Akinaka* of counsel) for appellee.

---

CONCURRING OPINION BY CIRCUIT JUDGE M. DOI

I concur.

However, because I find it difficult to glean any clear and meaningful criteria from the "well-settled rules of law" mentioned in the majority opinion to determine

whether Apana and Kaiwi were loaned servants, I find it necessary to state my thinking.

The loaned servant doctrine permits a general employer to avoid *respondeat superior* liability for injury caused by his servant's negligence in the course of employment by shifting the servant on to a borrowing employer. The critical question under that doctrine is how to determine when such shifting takes place in a given case resulting in the employee becoming a loaned servant of the borrower. As succinctly stated in *Nepstad* v. *Lambert,* 235 Minn. 1, 50 N.W.2d 614 (1951),

> "Though well established, the loaned servant principle has proved troublesome in its application to individual fact situations. The criteria for determining when a worker becomes a loaned servant are not precise; as a result, the state of the law on this subject is chaotic. Respectable authority for almost any position can be found, for even within a single jurisdiction the decisions are in conflict." 50 N.W.2d at 620.

The instant case involves the renting out of an instrumentality (a crane) together with its operator (crane operator and a signalman for the operator). For such a case, I find *Nepstad, supra,* most enlightening and the "right to control the particular act giving rise to the injury" test contained therein most persuasive.

> "The so-called 'right of control or direction' test assumes to place the responsibility for the servant's negligence upon the employer having the right to control his actions at the time the negligent act occurs. The theoretical basis for this test is probably the desire to impose the liability upon the employer who was in the best position to prevent the injury. Although this may be considered inconsistent with the liability-without-fault nature of *respondeat superior,* the con-

trol test has received widespread approval from the courts." 50 N.W.2d at 620.

This test has two elements in it: (1) control over (2) the particular act giving rise to the injury:

". . . Since the question of liability is always raised *because of some specific act done,* the important question is not whether or not he remains the servant of the general employer as to matters generally, but whether or not, *as to the act in question,* he is acting in the business of and under the direction of one or the other." (Emphasis added.) *Restatement, Agency,* § 227, Comment (a).

In a general sense, both lending and borrowing employers have relationships with an equipment operator which may be considered elements of control. The general employer may pay the wages, retain the power of discharge, or substitute different operators on different days. The borrower may direct the operator as to the work to be accomplished. However, the control which is meaningful is that which is directed over the particular act causing the injury.

And that control must be detailed authoritative control, as distinguished from mere suggestions or the giving of information to induce cooperative effort.

Applying the test to the instant case, it cannot be said as a matter of law that the evidence is insufficient to sustain the verdict.

The evidence is sufficient to support a finding that the negligent conduct resulting in injury to the plaintiff was that of Kaiwi in not keeping his eye on the bucket as it was lowered towards the men and/or that of Apana in not halting the crane's movement when he noticed Kaiwi looking away from the bucket. In either case, the manner in which the bucket was lowered would be the particular

act giving rise to injury, and Johnson Pacific exercised no detailed authoritative control over the manner in which the delivery of the bucket was executed.

The evidence indicates that between its crew foreman and bucket man (plaintiff), Johnson Pacific did give authoritative directions to Apana through Kaiwi as to when and where to deliver the buckets of concrete. From this, appellant argues that the particular conduct causing injury was Kaiwi's and Apana's delivery of the bucket without receiving any directions, at a time when and to a place where it was not expected, and that since that particular conduct was one which was under the authoritative control of Johnson Pacific, Apana and Kaiwi must be deemed loaned servants as a matter of law.

Although appellant's contention is an arguable one, and although the wrong timing of delivery to which appellant points may well be considered a cause of the injury, it is just as arguable and also reasonable to point to the negligent manner of delivery as a cause of plaintiff's injury. And, as has been previously pointed out, under the latter finding there would not be any detailed authoritative control on the part of Johnson Pacific over the manner of delivery.

*Nepstad* and the later case of *McCollum* v. *Smith*, 339 F.2d 348 (1964), both crane rental cases in which the crane operator was, as a matter of law, declared to be loaned servants are distinguishable on their facts. In each of those cases, the negligent act involved was in the movement of the crane by the operator, and the operator was directly under the detailed signals of the borrower as to each movement of the crane in its operation. In the instant case, the borrower directed the lender's operator through the lender's signalman as to when and where to deliver buckets of concrete but gave no signals to either as to the manner of lowering the bucket.