SAMSON K. KEPA, Claimant-Appellee, *v.* HAWAII WELDING COMPANY, LTD., and FIRST INSURANCE COMPANY OF HAWAII, Employer, Insurance Carrier-Appellant, and J. A. THOMPSON AND SON, INC., and INDUSTRIAL INDEMNITY COMPANY, Employer, Insurance Carrier-Appellee

NO. 5649

JANUARY 19, 1976

RICHARDSON, C.J., KOBAYASHI, OGATA AND MENOR, JJ., AND CIRCUIT JUDGE LANHAM IN PLACE OF KIDWELL, J., DISQUALIFIED

OPINION OF THE COURT BY KOBAYASHI, J.

This is an appeal by Hawaii Welding Company, Ltd. (Hawaii Welding) and its insurer, First Insurance Company of Hawaii (First Insurance) from a decision by the Labor and Industrial Relations Appeals Board (Appeals Board). The case was submitted to the Appeals Board to determine which, of two possible companies, was the liable employer of Samson Kepa (Kepa), a claimant under Hawaii's Workmen's Compensation Laws. At the time of the industrial accident which disabled him, Kepa was being paid by Hawaii Welding but was working on a project of appellee, J. A. Thompson & Son, Inc. (Thompson). The Appeals Board decided that Hawaii Welding had not transferred sufficient control over Kepa to Thompson so as to make Thompson the liable employer under HRS § 386-1 of the Workmen's Compensation Act. Hawaii Welding was, therefore, held to be the liable employer. We affirm.

### STATEMENT OF THE CASE

In early 1969, Thompson was engaged in a project to install a water line in Kahaluu on the island of Oahu as part of a contract they had with the Board of Water Supply. At a stage of the project, the need for a welder arose, but none of Thompson's welders was available to do the work.

Thompson called Hawaii Welding and requested a welder "to work as directed". In addition to other activities, Hawaii Welding was engaged in the business of renting out men and equipment on an hourly basis.

In response to Thompson's request, Hawaii Welding sent Kepa, one of their journeyman welders, to the Kahaluu project site. Kepa came to the job site fully equipped with Hawaii Welding equipment and a few of his own tools. The Hawaii Welding equipment included a pickup truck, oxygen tanks,

acetylene tanks, cutting torches, hoses, a welding machine, leads, rods, goggles and jacket.

Kepa's workday typically began at 6:30 a.m. at the Hawaii Welding base yard where he picked up a company truck and drove it to Thompson's Kahaluu project site. Work at the project started at 7:00 a.m. but Kepa was paid his regular wages by Hawaii Welding, starting at 6:30 a.m. For Kepa's services and the use of their equipment, Hawaii Welding charged Thompson a flat hourly rate ($13.20 per hour).

While at the project, Kepa was under the general supervision of the project superintendent, an employee of Thompson. The superintendent informed Kepa of the nature and general details of specific tasks that Kepa was to perform but Kepa had control of the manner, specific details, and methods of his own work. Thompson's supervisor had the right to order Kepa to leave the job site if he was not satisfied with Kepa's work or conduct but he or Thompson did not have the power to fire Kepa from his job with Hawaii Welding.

Thompson's need for a welder was not continuous and so Kepa worked only on days when the project superintendent felt he was needed. The superintendent was quite satisfied with Kepa's work and so whenever he needed a welder, he requested that Hawaii Welding send Kepa. Hawaii Welding was not obligated to send Kepa but did so whenever it could. On July 1, 1969 the superintendent made such a request, at which time Hawaii Welding sent Kepa pursuant to a master purchase order which stated that it would furnish a welder to Thompson "to work as directed". This master purchase order was the same one drawn up at the time of Thompson's initial request for a welder. Subsequent requests were generally done by telephone without drawing up new purchase orders.

On July 8, 1969, Kepa was performing a task at the Kahaluu job site that was assigned to him by the project superintendent. He was standing on a wooden-beam strut, that Thompson employees had set up, when the strut collapsed. Kepa fell approximately nine feet and struck portions of his back and the back of his head and thereby sustained compensable injuries under Hawaii's Workmen's Compen-

sation Laws. No one disputes the validity of his claim.

Hawaii Welding's insurer, First Insurance, began paying Workmen's Compensation benefits to Kepa before discovering that he was working on a Thompson project at the time of the accident. Subsequently, Hawaii Welding requested a hearing before the Workmen's Compensation Division of the Department of Labor and Industrial Relations urging that Kepa was an employee of Thompson under HRS § 386-1 when he was injured.

A hearing was held and the Director of Labor and Industrial Relations held that Hawaii Welding was the liable employer. Hawaii Welding and First Insurance appealed from the Director's decision to the Appeals Board. The Appeals Board also found Hawaii Welding to be the liable employer and from this decision the appellants appeal.

### RELEVANT STATUTE

HRS § 386-1 *Definitions*, in pertinent part, provides:

"Employee" means any individual in the employment of another person except where such employment is solely for personal, family, or household purposes.

Where an employee is loaned or hired out to another person for the purpose of furthering the other person's trade, business, occupation, or profession, the employee shall, beginning with the time when the *control of the employee is transferred to* the other person and continuing until the control is returned to the original employer, be deemed to be the employee of the other person regardless of whether he is paid directly by the other person or by the original employer. The employee shall be deemed to remain in the sole employment of the original employer if the other person fails to secure compensation to the employee as provided in section 386-121.

Whenever an independent contractor undertakes to perform work for another person pursuant to contract, express or implied, oral or written, the independent contractor shall be deemed the employer of all employees performing work in the execution of the contract, includ-

ing employees of his subcontractors and their subcontractors. However, the liability of the direct employer of an employee who suffers a work injury shall be primary and that of the others secondary in their order. An employer secondarily liable who satisfies a liability under this chapter shall be entitled to indemnity against loss from the employer primarily liable. (Emphasis added.)

HRS § 386-5 reads:

§ 386-5 *Exclusiveness of right to compensation*. The rights and remedies herein granted to an employee or his dependents on account of a work injury suffered by him shall exclude all other liability of the employer to the employee, his legal representative, spouse, dependents, next of kin, or any one else entitled to recover damages from the employer, at common law or otherwise, on account of the injury.

HRS § 386-88 (Supp. 1973) *Judicial review*, provides in part:

The decision or order of the appellate board shall be final and conclusive . . . . The appeal shall be on the record and the court shall review the appellate board's decision on matters of law only. . . .

ISSUE

The question of law is whether or not the Appeals Board used the proper standard in its determination that Hawaii Welding had not transferred control of Kepa to Thompson for purposes of the lent employee paragraph of HRS § 386-1.

We agree with the reasoning of the Appeals Board in holding the appellant liable herein. The paramount consideration in determining whether the alleged special employer is in fact a special employer of the worker in workmen's compensation lent employee cases in whether the alleged special employer exercised control over the details of the work of the loaned employee and such control strongly supports the inference that a special employment exists.

*McFarland v. Voorheis-Trindle Co.*, 52 Cal.2d 698, 705, 343 P.2d 923, 927 (1959). This view focuses on the general *relationship* between the claimant and the employers during the course of employment rather than upon the relative ability of the lending employer as compared to that of the borrowing employer to prevent the accident which caused the injury.

> Workmen's compensation laws were enacted as a humanitarian measure, to create legal liability without relation to fault. (Citation omitted.) They represent a socially enforced bargain: the employee giving up his right to recover common law damages [in tort] from the employer in exchange for the certainty of a statutory award for all work-connected injuries. Since liability is made dependent on a nexus to the job, the essential prerequisite for coverage under workmen's compensation acts is the existence of an employer-employee relationship. . . .

*Evanson v. University of Hawaii*, 52 Haw. 595, 598, 483 P.2d 187, 190 (1971). *See also* HRS § 386-5.

In determining whether control is transferred to a borrowing employer an additional factor to be considered is whether the lent employee was using heavy equipment that was owned by the lending employer. Professor Larson states:

> The factor that seems to play the largest part in lent-employee cases is that of furnishing heavy equipment. Many cases have found continuing liability in the general employer when he furnishes operators together with road equipment, excavating equipment, steam and truck shovels, draglines, cranes, trucks, air drills, air riveters, *welding equipment,* and barges. Although there are plenty of *contra* cases, . . . generally based on overriding evidence of control by the special employer, . . . *the majority of the decisions have been influenced by the arguments both that the general employer would naturally reserve the control necessary to ensure that his equipment is properly used, and that a substantial part of any such operator's duties would consist of the continuing duty of maintenance of the equipment.* (Emphasis added.)

1A LARSON, WORKMEN'S COMPENSATION LAW, § 48.30 (1973).

Under the facts herein we are of the opinion that the control of Kepa was not transferred to Thompson as provided under HRS § 386-1. Thus, Kepa cannot be deemed to be the employee of Thompson under the Workmen's Compensation statute.

Hawaii Welding, on the other hand, vigorously contended that the "fault standard" enunciated in *Nakagawa v. Apana,* 52 Haw. 379, 477 P.2d 611 (1970), relative to the negligence of a "loaned servant" is just as applicable in determining the liability between a non-negligent general employer and a negligent borrowing employer in a workmen's compensation case.

In *Nakagawa,* plaintiff-Nakagawa, an employee of Johnson Pacific Co., was working on the roof of the Maui Community College Building when he was struck and injured by a bucket of cement. The cement bucket was being lifted to the roof of the building by a crane owned by the defendant and operated by an employee of the defendant. The signalman for the operator of the crane was also an employee of the defendant. Defendant had rented the crane, including defendant's employees, to plaintiff's employer. Plaintiff filed suit against the owner of the crane for the negligence of its employee on the theory of respondeat superior. The crucial factual issue was whether the operator of the crane and the signalman were the servants of the defendant or of the plaintiff's employer when they were guilty of the negligence which caused plaintiff's injury. This court held that the trial court did not err in leaving the determination of the issue of borrowed servant to the jury. The jury found against the defendant and awarded damages to the plaintiff.

We are of the opinion that *Nakagawa* is not apposite to the case at hand. In workmen's compensation cases the issue of negligence is not a factor. Based on a humanitarian policy of the workmen's compensation law, the claimant-worker is entitled to compensation for a covered work injury regardless of his negligence or lack of negligence on the part of the

employer. Furthermore, the relationship between an employer and employee must be entered into in a deliberate manner with the informed consent of both parties. *See* LARSON, *supra,* § 48.10. Otherwise, the "employment relationship" could vary from moment to moment depending upon which employer controls the instrumentalities or circumstances that cause the injury. Such a situation is contrary to the concept of the "bargain" referred to in *Evanson, supra,* in which the employee gives up his right to sue in tort in exchange for the certainty of a workmen's compensation award. Instead, such an arrangement could impose upon the loaned employee a relationship, which directly affects his legal rights, completely against his will. We cannot accept such a fortuitous scheme to determine the legal rights of an injured workman.

Affirmed.

*Walter Davis (Davis, Witherwax, Playdon & Gerson* of counsel) for employer, insurance carrier-appellant.

*John A. Roney (Stubenberg, Shigemura, Roney & Gniffke* of counsel) for employer, insurance carrier-appellee.