CHARLES G. HARTER, Claimant-Appellee, *v.* COUNTY OF HAWAII, Employer-Appellant, Self-Insured, and GARDEN ISLAND HELICOPTERS, INC., dba HAWAII HELICOPTERS INTERNATIONAL, and FIREMAN'S FUND AMERICAN INSURANCE COMPANY, Employer, Insurance Carrier-Appellee

NO. 6627

MAY 22, 1981

RICHARDSON, C.J., OGATA, MENOR, LUM AND NAKAMURA, JJ.

OPINION OF THE COURT BY NAKAMURA, J.

The County of Hawaii (hereafter the County) has requested a judicial review of a Labor and Industrial Relations Appeals Board decision applying the "lent employee" provisions of the Hawaii Workers' Compensation Law.[1] As the record sustains the Board's finding that the County had assumed control over Charles G. Harter when his work injury occurred, we affirm the decision that he was an "employee" of the County within the meaning of HRS § 386-1.

I.

During times relevant to the case, Garden Island Helicopters, Inc., dba Hawaii Helicopters International (hereafter Hawaii Helicopters), was an employer engaged primarily in the business of furnishing helicopter services to others for industrial and sightseeing purposes and Charles G. Harter (hereafter Harter or the Claimant) was a pilot in its employ. On July 1, 1972 Hawaii Helicopters and the County of Hawaii entered into an agreement whereby Hawaii Helicopters agreed to furnish the County a helicopter "with pilot" for a two-year period. The "lease" agreement provided, *inter alia,* that the aircraft would be based at the Waiakea Fire Station in Hilo, Hawaii to be used exclusively by the County to support firefighting and other County functions.[2]

---

[1] The pertinent provisions of HRS § 386-1 read:
"Employee" means any individual in the employment of another person.
Where an employee is loaned or hired out to another person for the purpose of furthering the other person's trade, business, occupation; or profession, the employee shall, beginning with the time when the control of the employee is transferred to the other person and continuing until the control is returned to the original employer, be deemed to be the employee of the other person regardless of whether he is paid directly by the other person or by the original employer. The employee shall be deemed to remain in the sole employment of the original employer if the other person fails to secure compensation to the employee as provided in section 386-121.

[2] The agreement stated in part:
1. *SCOPE OF CONTRACT* . . .
   A. Supporting Fire Station, Police, Civil Defense, & Hospitals.
      1. Delivery of firefighters, equipment and supplies to fire locations any-

Pursuant to the foregoing agreement, Hawaii Helicopters placed a helicopter at the County's disposal and assigned one of its employees as the regular pilot. The aircraft was operated under the direction of a battalion chief of the Hawaii County Fire Department, and the pilot was not permitted to operate the aircraft for any other purpose, except to conduct daily pre-flight checks. Hawaii Helicopters continued to be responsible for the craft's maintenance and provided mechanics and tools as required.

On March 12, 1973, while on a four-day assignment as a temporary replacement for the regular pilot of the "leased" helicopter, Harter was directed to fly the craft to Waimea to support efforts by the fire department to extinguish a brush fire. The specific task he was ordered to perform was to transport firefighters into and out of the affected area. When the mishap causing serious injury to Harter occurred, he was on a mission to remove a battalion chief of the department from the scene of the blaze.

Harter subsequently claimed workers' compensation benefits for the work injury. While the fact that he had suffered an injury arising out of and in the course of employment was acknowledged by all parties concerned, a question was raised on whether Hawaii Helicopters or the County was the employer responsible for the payment

where on Hawaii. . . .

B. This contract requires ready availability of pilot(s) and helicopter for seven days per week for the period of the contract. . . .

. . . . .

E. It is understood that the pilot is captain of his ship and is free to refuse any flight or landing which he considers hazardous or unsafe. Operations under this contract will normally entail risks, which the Contractor hereby assumes. . . .

. . . . .

3. *AVAILABILITY*

A. The helicopter must be in readiness to perform flights on short notice. Pilot must maintain availability at the heliport during regular standby hours, so no longer than ten (10) minutes elapses between the time dispatch orders are received and time helicopter is airborne in the configuration of the mission.

B. Standby hours will be eight consecutive hours during daylight hours, seven days a week. During that time, ready availability is required.

C. After standby hours, pilot must inform the County's representative how he can be reached during emergencies, and he must be available to the aircraft and airborne within thirty (30) minutes.

D. The bulk of missions to be flown will take place on the Island of Hawaii, but at times, the helicopter and crew may be dispatched to other islands.

of compensation. The Director of Labor and Industrial Relations, who is responsible for initial determinations under the compensation law, held Hawaii Helicopters liable for the payment of benefits to the Claimant. This determination, however, was reversed by the Labor and Industrial Relations Appeals Board on an appeal filed by Hawaii Helicopters. The County's appeal to this court followed.

II.

The responsibility for the payment of workers' compensation benefits to a "lent employee" is at issue. The question posed is neither complex nor novel, for it is governed by an express statutory provision that previously has been subject to interpretation.

When an employee is "loaned or hired out to another for the purpose of furthering the other person's trade, business, occupation, or profession," HRS § 386-1 provides that the borrowing employer's potential liability for compensation payments commences with the transfer of control over the employee and continues until such control is returned to the original employer. Our decisions have reinforced the legislative design evident from the plain wording of HRS § 386-1 that "control" is the principal determinant of compensation liability in a "lent employee" situation.

In *Kepa v. Hawaii Welding Co.*, 56 Haw. 544, 545 P.2d 687 (1976), where the issue was first encountered, we affirmed a holding of the Labor and Industrial Relations Appeals Board that the lending employer remained liable for compensation despite the loan of an employee because sufficient control over the employee had not been transferred to the borrowing employer. We said:

> The question of law is whether or not the Appeals Board used the proper standard in its determination that Hawaii Welding had not transferred control of Kepa to Thompson for purposes of the lent employee paragraph of HRS § 386-1.

> We agree with the reasoning of the Appeals Board in holding the appellant liable herein. The paramount consideration in determining whether the alleged special employer is in fact a special employer of the worker in workmen's compensation lent employee cases in [sic] whether the alleged special employer exercised control over the details of the work of the loaned

employee and such control strongly supports the inference that a special employment exists.

56 Haw. at 548, 545 P.2d at 691. Although the request from the borrowing employer was for a welder "to work as directed," we nevertheless affirmed the administrative ruling that an employment relationship governed by HRS § 386-1 had not been established. The presence of factors indicating a retention of control led us to concur with the Appeals Board. For example, the borrowing employer's need for a welder was sporadic and of short duration, and the lending employer furnished the welder's equipment and ostensibly reserved such control over the employee as necessary to ensure its proper use and maintenance. And, significantly, there was no showing that an employment relationship had been established with the knowing consent of the employee.[3]

The lending employer in *Kepa* also asserted it should not be liable for compensation under principles enunciated in *Nakagawa v. Apana,* 52 Haw. 379, 477 P.2d 611 (1970), a negligence action where a lending employer's vicarious tort liability was determined in accord with common law principles governing master-servant relationships and the doctrine of *respondeat superior.* However, we considered *Nakagawa* inappropriate precedent for the resolution of a worker's right to benefits under a beneficent statute where negligence or a lack thereof is irrelevant.

---

[3] Our statement in this regard was:

[T]he relationship between an employer and employee must be entered into in a deliberate manner with the informed consent of both parties. *See* LARSON, *supra,* § 48.10. Otherwise, the "employment relationship" could vary from moment to moment depending upon which employer controls the instrumentalities or circumstances that cause the injury. Such a situation is contrary to the concept of the "bargain" referred to in *Evanson, supra,* in which the employee gives up his right to sue in tort in exchange for the certainty of a workmen's compensation award. Instead, such an arrangement could impose upon the loaned employee a relationship, which directly affects his legal rights, completely against his will. We cannot accept such a fortuitous scheme to determine the legal rights of an injured workman.

56 Haw. at 551, 545 P.2d at 692. Moreover, HRS § 386-1 defines "employment" as "any service performed by an individual for another person under any contract of hire or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully entered into."

*Yoshino v. Saga Food Service,* 59 Haw. 139, 577 P.2d 787 (1978), again presented the issue posed in *Kepa,* and once more we "made clear that the control test is the primary guideline for determining whether an employer is a special employer for workers' compensation purposes." 59 Haw. at 143, 577 P.2d at 790. But unlike the situation in *Kepa,* the record in *Yoshino* clearly manifested that the "lent employee" was furthering the business of the borrowing employer and was under its control when injured. We affirmed the decision of the Labor and Industrial Relations Appeals Board on the basis of the record and criticized the Board's primary reliance on a "relative nature of the work test" in reaching its conclusion. For HRS § 386-1, in our opinion, made "control" of the employee the predominant consideration in fixing compensation liability between a lending and a borrowing employer.

### III.

The County contends the circumstances here are like those in *Kepa.* It argues Harter was primarily engaged in furthering Hawaii Helicopters' business when injured, and as "captain of his ship" he had "control over the manner and specific details of flying the helicopter." That he was a temporary relief pilot is emphasized. In the County's view the foregoing factors compelled a ruling that Hawaii Helicopters is the employer responsible for the payment of Harter's compensation benefits. We disagree.

The Appeals Board was affirmed in *Kepa* because there was an inadequate demonstration that the general employer had relinquished control of the employee and because we were unwilling to have the legal rights of an injured worker turn on employment relationships that could "vary from moment to moment depending upon which employer controls the instrumentalities or circumstances that cause the injury." 56 Haw. at 551, 545 P.2d at 692. But the resemblance between the facts here and the situation in *Kepa* is slight; that Hawaii Helicopters had relinquished and the County had assumed control of Harter's activities with his consent at the crucial time is hardly an open question.

Harter resided on Kauai where the operations of Hawaii Helicopters were centered. But he periodically flew to Hawaii to provide

relief for the regular pilot of the "leased" helicopter over the span of the "lease" agreement. Company practice was for the regular pilot to fly the aircraft for ten-day stretches and then to be relieved for four days by other pilots. When injured, Harter was on one of these sojourns in relief of the regular pilot. During such a tour of duty, Harter's "standby hours," those when he was expected to be ready for flight within ten minutes after the receipt of orders, were eight consecutive hours in the daytime; he was "on call" and required to be available for flight within thirty minutes for the remainder of the twenty-four hours. He thus spent a large part of his daylight hours while on Hawaii at or near the Waiakea Fire Station and remained reasonably close thereto for the rest of the day. Most importantly, he was permitted to fly missions only as directed by the proper County official. We would not quibble with the finding of the Appeals Board that pertinent control of the employee was in the County.

The County is not in error when it states Harter, when injured, was furthering the business of Hawaii Helicopters, whose principal business was furnishing helicopters and pilots to others. We are aware that in most labor-loan situations the interests of the lender are being advanced also. In this instance, however, we cannot ignore the overriding purpose of Harter's ill-fated mission, which was in furtherance of the County's public safety function.

The County's "captain of the ship" argument, likewise, is not entirely without merit. The agreement between lender and borrower stated "the pilot is captain of his ship and is free to refuse any flight or landing which he considers hazardous or unsafe." Although the foregoing language arguably suggests the County was not to "exercise control over the details of the work of the loaned employee," we view the clause as a case of deference to professional judgment, particularly in the area of safety.[4] The agreement further provided that "[o]perations under this contract will normally entail risks, which the Contractor [Hawaii Helicopters] hereby assumes. . . ." The imposition of liability for compensation never-

---

[4] Although compliance with occupational safety laws has not been raised, we note that the federal Occupational Safety and Health Act grants an employee the right to choose not to perform his assigned task because of a reasonable apprehension of death or serious injury coupled with a reasonable belief that no less drastic alternative is available. Whirlpool Corp. v. Marshall, 445 U.S. 1 (1980).

theless must follow the dictates of HRS § 386-1, for the Workers' Compensation Law regards any attempt to shift or evade such responsibility with definite disfavor.[5]

We also recognize that where general employers furnish "equipment and operators" to special employers, courts have ruled, more often than not, that compensation liability remains with the former; *Kepa v. Hawaii Welding Co., supra,* stands in testimony thereof. *See also* 1C A. Larson, *The Law of Workmen's Compensation* § 48.23 (1980). But the special circumstances recounted earlier, manifesting a transfer of control over the employee here, clearly outweigh any purported retention of authority to ensure the proper use and maintenance of equipment.

Affirmed.

*Stephen Menezes (Earl T. Nakasato* on the brief), Deputies Corporation Counsel, for employer-appellant.

*Jeffrey S. Portnoy (Cades, Schutte, Fleming & Wright,* of counsel) for employer, insurance carrier-appellee.

---

[5] HRS § 386-9 reads:

Except as provided in section 386-78 [approved compromises], no contract, rule, regulation or device whatsoever shall operate to relieve the employer in whole or in part from any liability created by this chapter.