**LINDA MARIA,** now known as Linda Remigio, Plaintiff–Appellant, v. **ERNEST N. FREITAS**, Defendant–Appellee

NO. 15311

(CIV. NO. 87–1295–04)

JUNE 18, 1992

LUM, C.J., WAKATSUKI, MOON, LEVINSON, JJ., AND INTERMEDIATE COURT OF APPEALS CHIEF JUDGE BURNS, IN PLACE OF KLEIN, J., RECUSED

OPINION OF THE COURT BY MOON, J.

Plaintiff–appellant Linda Maria (Maria) appeals from a circuit court judgment entered in favor of defendant–appellee Ernest Freitas (Freitas). At trial, Maria claimed an equitable interest in property and business acquired and improved upon during the course of her cohabitation and family relationship with Freitas based upon theories of implied contract, estoppel, quasi–estoppel, and constructive trust. The trial court held that the undisputed facts did not support the theories advanced by Maria and entered judgment in favor of Freitas. On appeal, Maria asserts that the trial court erred in its application of the law. We disagree. Contrary to Maria's assertions, the facts of this case indicate the existence of a cohabiting relationship between two intentionally unmarried parties with separate property rights and interests. We therefore affirm the trial court's decision.

I.

The circuit court's findings of fact are undisputed, and the relevant facts are as follows:

Maria and Freitas shared a cohabiting, family relationship for approximately nineteen and one–half years from about January 1967 to September 7, 1986. Maria met Freitas in mid–1966, and Freitas moved into Maria's rented Ewa Beach house in early 1967.

Freitas had no assets and was unemployed. Maria, who worked at Kentucky Fried Chicken, paid the rent and other living expenses, including the cost for food, until Freitas got a job in mid–April 1967.

In July 1967, the parties moved to a Houghtailing Street address, which was rented in Maria's name. Maria continued to work at Kentucky Fried Chicken while Freitas held various jobs. They used their incomes to pay their living expenses, which included food, rent, and other household bills.

Maria became pregnant in January 1968 and their son, Dean, was born on October 14, 1968. Maria stayed at home to care for Dean until July 1969. During this period, Maria was receiving welfare support and Freitas worked at various automotive repair jobs. Maria also attended Honolulu Community College to learn clerical skills during a six–month period in 1969. From July 1969 to May 1973, Maria held several clerical positions and Freitas continued to hold various automotive repair jobs.

In May 1973, Maria secured work at the Army–Air Force Exchange System where she has remained continuously employed on a full–time basis. Sometime in 1973, Freitas opened his own business, "Ernie's Transmission Service & Repair," in Waipahu, which he has operated as a sole proprietorship. Additionally, in 1974, Freitas and Maria became involved with a business known as TT Racing, which operated motorcycle races. From 1974 to 1979, Freitas organized TT Racing and competed therein as a motorcycle racing participant. Maria made posters for TT Racing and collected admission money at the gate.

In November 1973, Freitas purchased a residence in Pearl City. Maria contributed $600 towards the down payment and Freitas paid the balance of the down payment from funds he had saved. Freitas held title to the property in his name only, and he was the sole party to the mortgage. The Pearl City residence was initially rented and the rental income covered the mortgage,

maintenance, and tax expenses of the property. In July 1975, Freitas, Maria, their son Dean, and Maria's mother moved into the Pearl City home, where they lived until 1979.

In April 1979, Freitas sold the Pearl City home and purchased a new residence in Aiea. The profit realized from the sale of the Pearl City home partially satisfied the down payment on the Aiea residence. Freitas paid the balance out of profits from the motorcycle racing operation. Again, Freitas held title to the Aiea property in his name only and was the sole party to the mortgage. Freitas, Maria, Dean, and Maria's mother moved into the Aiea house where they continued to reside until September 7, 1986 when Freitas and Maria terminated their relationship and Freitas moved out of the residence.[1]

From 1973 until their separation in 1986, Frietas paid for the household expenses incurred by both parties and their child. Freitas managed the transmission business while Maria managed the household and continued to work at the Army–Air Force Exchange. From time to time, Maria used some of her earnings to purchase a few supplies and minor equipment for the transmission business. In addition, she occasionally purchased household items such as cleaning supplies, linens, and groceries. Maria helped to maintain and did minor repairs to the Pearl City and Aiea residential properties.

The parties always maintained separate checking, savings, and credit union accounts. They always filed separate income tax returns, never held any property jointly or as tenants in common at any time during their relationship, and never entered into any written or oral agreements with one another regarding their separate property. Both parties carried various life insurance policies and neither ever named the other as beneficiary. During the

---

[1] In January 1987, Freitas gave Maria $5,000 to assist her in buying a new residence. Maria vacated the Aiea residence in April 1987, at which time Freitas returned to the residence.

relationship, Freitas bought grave plots for himself and his father, but not for Maria.

When Freitas moved in with Maria in 1967, she had $10,000.00 in cash from her former marriage, which she had kept inside a shoe box in her closet for seventeen years. She deposited the funds into her savings account in 1983. By the date that her relationship with Freitas ended, Maria had accumulated savings that totaled approximately $37,000.00. At no time did Freitas have any knowledge of these savings while the parties lived together.

During their relationship, Freitas and Maria were known as "husband and wife" to some members of the public, including Dean's school, contractors, and providers of goods and services. For example, the architectural plans for the two residential properties referred to Freitas and Maria as "Mr. and Mrs. Freitas." Also, Freitas occasionally referred to Maria as his "old lady." Although neither of them ever corrected these mistaken assumptions regarding their marital status, Freitas never told anyone that they were legally married. Furthermore, Maria had refused Freitas's proposals of marriage on several occasions.

Maria brought this action claiming entitlement to a share of Freitas's separate property and for support payments. The trial court entered its findings of fact and conclusions of law, holding that Freitas was not liable to Maria and denied her claim. Maria appealed.

## II.

On appeal, Maria challenges the trial court's conclusions of law contending that the court erroneously concluded that she was not entitled to equitable relief under the theories of implied contract, equitable estoppel, quasi–estoppel, or constructive trust. "An appellate court may freely review conclusions of law and the applicable standard of review is the right/wrong test." *Hilo Crane Serv., Inc. v. Ho*, 5 Haw. App. 360, 693 P.2d 412 (1984), *cert.*

*denied*, 67 Haw. 685, 744 P.2d 781 (1985). "A conclusion of law which is supported by the trial court's findings of fact and which reflects an application of the correct rule of law will not be overturned." *SGM Parntership v. Nelson*, 5 Haw. App. 526, 529, 705 P.2d 49, 52 (1985).

## A.

Maria contends that the trial court erred because it found that the facts did not support the existence of an implied–in–fact contract. A court of equity can find a contract implied–in–fact when cohabiting parties "by their conduct and/or words [agree] to share their earnings and the fruits of their joint labor." *Boland v. Catalano*, 202 Conn. 333, 336, 521 A.2d 142, 144 (1987). However, "[c]ohabitation, no matter for how long, does not by itself prove the existence of a contract implied–in–fact." *Aehegma v. Aehegma*, 8 Haw. App. 215, 223, 797 P.2d 74, 79 (1990) (citation omitted).

In *Aehegma*, the plaintiff had lived with the defendant for eight years, during which time they accumulated various real and personal properties. Plaintiff was an artist, whose expenses exceeded his earnings, and defendant paid for most of the living expenses. *Id.* at 217–18, 797 P.2d at 77. The parties held joint bank accounts, filed joint tax returns, and engaged in a fictitious wedding ceremony after which both parties assumed the same surname, Aehegma. *Id.* At the dissolution of the relationship, plaintiff sued defendant for divorce, division of quasi–marital property, spousal support, a constructive trust, and an accounting. *Id.* at 219, 797 P.2d at 78.

On appeal, the Intermediate Court of Appeals (ICA) affirmed the trial court and refused to find that an implied–in–fact contract existed between the parties because the plaintiff did not show that the defendant ever understood, expected or intended that plaintiff would be entitled to rehabilitative support or to share in

the increased value of property acquired during the period of cohabitation. Having failed to demonstrate any such understanding, expectation or intent, the ICA did not have to decide the issue of plaintiff's implied contractual rights. *Id.*

We likewise need not reach the implied contract question in this case because the facts do not indicate that Freitas intended, understood or expected that Maria would partake of one–half of his separate property interests upon dissolution of their relationship. Mere recitations of the contributions Maria made in maintaining the household, reference to Maria's small contributions to Freitas's business, and the fact that several friends and other third– parties regarded Maria as Freitas's "wife" or "old lady," do not constitute evidence of Freitas's intent to share his property interests with Maria upon termination of their relationship.

On the contrary, the facts demonstrate a deliberate design to keep their property separate. Maria and Freitas did not commingle their money. They did not file joint tax returns or keep any joint bank accounts. Maria made a minimal contribution towards the purchase of the Pearl City residence, did not contribute any monies in acquiring the Aiea property, and her name was not listed on either the title or mortgage documents. Most importantly, Maria had managed to amass some $37,000.00, totally unbeknownst to Freitas, during the whole of the relationship. Maria argues that the $37,000.00 grew out of an original sum of $10,000.00 of separate property, which she was awarded from a prior marriage and which had increased by way of dividends, interest, and gifts. She further claims that she would have given Freitas the money if he had asked for it.

However, Maria's logic fails to support her claims for two reasons. First, because Freitas knew nothing about the $37,000.00, he would obviously not have been able to ask for it. Second, Maria's claim to an interest in Freitas's property is based upon her contention that Freitas was able to have the free time to amass his property

only through her efforts and contributions. Maria submits that without her efforts, Freitas would have incurred other expenses and had time contraints on his business ventures. However, the same argument could apply to Maria's ability to amass $37,000.00 in savings. Without the monetary contributions Freitas made, such as paying for most of the expenses, and almost all the child–raising costs, it is inconceivable that Maria could have retained all the cash without making significant withdrawals from time to time. Her argument thus fails, and we conclude that the court did not err in refusing to find an implied contract.

## B.

Maria also claims an interest in Freitas's property under the theories of equitable estoppel and quasi–estoppel. The theory of equitable estoppel requires proof that one person wilfully caused another person to erroneously believe a certain state of things, and that person reasonably relied on this erroneous belief to his or her detriment. *Aehegma v. Aehegma*, 8 Haw. App. 215, 233, 797 P.2d 74, 80 (1990) (citing *Strouss v. Simmons*, 66 Haw. 32, 657 P.2d 1004 (1982); *Anderson v. Anderson*, 59 Haw. 575, 585 P.2d 938 (1978)). There is no evidence that Freitas wilfully caused Maria to believe either that she was married to him or that he intended that she would share in the proceeds of property he obtained during their cohabitation. There is also no evidence that Maria relied, to her detriment, on promises to share in Freitas's future profits and spent her personal savings accordingly. In fact, as is evidenced by Maria's separate cash savings, she managed to add significant sums throughout the years, which funds she did not jeopardize despite Freitas's intermittent needs for cash throughout the relationship. We conclude that Maria has failed to prove the material elements of equitable estoppel.

Additionally, the theory of quasi–estoppel does not apply here because the findings of fact do not indicate a change in attitude by

Freitas at any time. Under the theory of quasi–estoppel, a party is precluded " 'from asserting to another's disadvantage, a right inconsistent with a position previously taken by him.' " *Id.* at 234, 797 P.2d at 80 (citing *Hartmann v. Bertelmann*, 39 Haw. 619, 628 (1952), quoting *Montclair Trust Co. v. Russell Co.*, 135 N.J. Eq. 570, 573, 39 A.2d 641, 643 (1944)). As the court in *Aehegma* pointed out, "[defendant] never took the position that [plaintiff] was .or would be entitled to support from her and a share of her property. . . . If quasi–estoppel applies in this case, it applies against [plaintiff]." *Id.* at 224, 797 P.2d at 80. The same logic applies here. The fact that Maria turned down Freitas's proposals of marriage in the past, coupled with her acquisition of $37,000.00 in cash unbeknownst to Freitas, leads this court to conclude that if anyone should be estopped from asserting a claim inconsistent with that asserted in the past, that person should be Maria.

## C.

Finally, Maria argues that the trial court should have imposed a constructive trust on Freitas's property, and that Freitas will be unjustly enriched if he is allowed to keep the entire product of their alleged joint efforts. A constructive trust will be imposed where the evidence is clear and convincing that one party will be unjustly enriched if allowed to retain the entire property. *Aehegma v. Aehegma*, 8 Haw. App. 215, 224, 797 P.2d 74, 80 (1990) (citing *Kam Oi Lee v. Fong Wong*, 57 Haw. 137, 139–40, 552 P.2d 635, 637–38 (1976)). Maria did not elucidate the extent of her monetary contributions to the houses, businesses or TT Racing by clear and convincing evidence. The trial court, therefore, correctly ruled that she did not establish the elements of a constructive trust, and that Freitas did not hold his separate property as a constructive trustee for Maria's benefit.

Plaintiff contends that Hawaii should extend its common law principles to encompass unmarried cohabitants and promote fair

and just distributions of property. However, as the court in *Aehegma* pointed out, marriage holds "positive and negative legal consequences for each party. A person who is not legally married does not qualify for the positive legal consequences of marriage." *Id.* at 221, 797 P.2d at 79. Maria cannot claim a right to quasi–marital property when the facts reveal an ongoing understanding of separate property rights and intentions.

Accordingly, the judgment is affirmed.

*Jason F. Oliver* and *A. Debbie Jew*, of Oliver, Lee, Lawhn, Ogawa & Lau, for plaintiff–appellant.

*Matthew S. K. Pyun, Jr.* and *Harrison K. Kawate*, of the Law Offices of Matthew S. K. Pyun, Jr., for defendant–appellee.