974 P.2d 51

**Shawn POTTER, Claimant–Appellant,**

v.

**HAWAII NEWSPAPER AGENCY, Employer–Appellee, Self–Insured, and Travelers Insurance Company, Insurance Adjuster–Appellee.**

**No. 21261**

Supreme Court of Hawai'i.

Feb. 19, 1999.

Roy K.S. Chang and Harvey M. Demetrakopoulos (of Shim & Chang) on the briefs, for the claimant-appellant Shawn Potter.

James N. Duca and Robert C. Kessner (of Kessner Duca Umebayashi Bain & Matsunaga), on the briefs for the employer-appellee Hawaii Newspaper Agency and Travelers Insurance Company.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by LEVINSON, J.

This case arises from an accident that occurred when the fourteen-year-old claimant-appellant, Shawn Potter, was struck by an automobile while he was riding a moped. Potter was a "newspaper dealer" for the employer-appellee Hawaii Newspaper Agency (the HNA) at the time, pursuant to an "independent contractor agreement." The moped was owned by an HNA employee, Shawn Toyozaki, who was Potter's district manager. Potter subsequently filed a civil lawsuit against the driver of the automobile, Toyozaki, and the HNA. Six months after the lawsuit was filed, the HNA filed a "WC-1 Employer's Report of Industrial Injury" with the Department of Labor and Industrial Relations, alleging that Potter was an HNA employee and "claimant" for workers' compensation benefits. When Potter's parents notified the Director of the Department of Labor and Industrial Relations (the Director) that they did not wish to pursue the claim, the Director denied it, as well as the HNA's subsequent request for reconsideration.

The HNA then appealed the Director's decision to the Labor and Industrial Relations Appeals Board (LIRAB), which ruled that Potter was an HNA employee for purposes of Hawai'i Revised Statutes (HRS) ch. 386 (the Workers' Compensation Law). Potter filed an application to reopen the case and/or motion for clarification, alleging that the LIRAB lacked jurisdiction to hear the

**414**

appeal. When the LIRAB denied Potter's application, the present appeal ensued.

On appeal, Potter argues that the LIRAB: (1) lacked jurisdiction to hear the appeal because (a) no lawful claim for benefits was ever made, inasmuch as HNA was not authorized to file a claim on Potter's behalf, and (b) only an aggrieved party can appeal a decision of the Director, and the HNA was not aggrieved, inasmuch as it was not ordered to pay benefits to Potter; (2) erred as a matter of law when it concluded that (a) Potter was a "claimant" seeking workers' compensation benefits, (b) Potter was an "employee" of the HNA on the date of his injury, (c) the work arrangement between Potter and the HNA constituted a "contract for hire," (d) the "control test" must be applied to determine whether an employer-employee relationship existed, even if the injured worker has not sought workers' compensation benefits, (e) any contract for hire that might have existed between Potter and the HNA was void or voidable, inasmuch as (i) Potter was a minor, and/or (ii) contracts to perform illegal acts are void as a matter of public policy; (3) erred as a matter of law when it issued its order vacating the decision of the Director; and (4) erred as a matter of law when it denied Potter's application to reopen and motion for clarification. Because no lawful claim for benefits was made, we hold that the Director lacked the statutory authority to act in this matter and that the LIRAB had no jurisdiction to hear the HNA's appeal. Accordingly, we reverse the LIRAB's order.

## I. BACKGROUND

On November 21, 1992, at approximately 10:20 p.m., Potter was operating a moped on Winam Avenue, in the City and County of Honolulu, when he was struck by an automobile that ran a stop sign at the Herbert Street intersection. He was fourteen years old at the time of the accident. As a result of the accident, Potter suffered severe head injuries, a ruptured spleen, and a fractured femur. Upon his discharge from the Rehabilitation Hospital of the Pacific in May 1993, Potter was confined to a wheelchair and re-

quired assistance with activities of daily living. Potter has claimed that he incurred medical expenses exceeding $307,000.00.

The moped Potter was riding when the accident occurred belonged to Toyozaki, who was one of the HNA's district managers. Potter was a "newspaper dealer" in Toyozaki's assigned district. In order to become a dealer for the HNA, Potter and his parents had executed a "Statement of Intention," which recited that Potter would "operate [his] own retail distribution and delivery business as an independent contractor." The HNA's relationships with its newspaper dealers were governed by the terms of the "Newspaper Dealers Agreement," which provided, *inter alia*, that:

[t]his Agreement ... is made in reference to Dealer's Statement of Intention to enter into the retail distribution and delivery business as an independent contractor by purchasing newspapers from the Company at such wholesale prices as may be established by the Company from time to time in order to resell such newspapers through the Dealer's distribution or delivery service....

. . . .

Company will furnish a statement of account every four weeks to Dealer payable in accordance with Company's billing terms and procedures, as well as a final statement of account upon termination of the Agreement....

... Dealer shall assume full control over and responsibility for such newspapers and the operations of his or her distribution and delivery business, including the delivery of such newspapers to dealer's customers and the collection of payment from dealer's customers.

Company neither reserves, nor will it exercise, any control over the method or manner by which Dealer delivers, distributes or resells newspapers purchased by Dealer from Company. Dealer, as an independent contractor, has sole control over the method or manner by which his newspapers are delivered, distributed or sold, including, but not limited to, the equipment used, the means of transportation used, the time and place of delivery of the newspa-

pers to his customers, the time and method of payment arranged with his customers, the method of arranging the newspaper for final delivery to the customer, and whether and on what terms to hire employees, agents or other subordinates. Moreover, Dealer recognizes his responsibility.

Accordingly, the Dealer agrees to accept full and exclusive responsibility for his own acts and those of his employees, agents, and subordinates and to indemnify and hold the Company harmless from and reimburse it for any liabilities, claims, demands, costs, and expenses incident to any claim, loss, damage, or injury of any kind to any person or property because of or due to any act or conduct of Dealer or any of Dealer's employees, agents, or other subordinates.

As "independent contractors," HNA's newspaper dealers did not receive any employee benefits. The dealers did not receive an hourly wage, but, rather, purchased newspapers at wholesale from the HNA, which they resold to their customers at a profit. The HNA did not take responsibility for withholding income tax or Social Security payments on the dealers' behalf.

Notwithstanding the HNA's averments that its dealers had "sole control" over the equipment that they used to deliver their newspapers, Toyozaki owned several mopeds that he made available to the dealers working within his district. When the dealers were loaned the mopeds to use when making their deliveries, they were also permitted to take them home and use them at other times as well. Toyozaki was aware that Potter and some of his other dealers were not old enough to operate the mopeds legally and that they possessed no licenses to drive them. As explained by another carrier:

Q: Now, when you started using the moped, did you know that you needed a license to operate a moped?

A: Yes.

Q: Did Shawn Toyozaki know that you guys needed a license to operate a moped?

A: That Shawn Toyozaki know that I needed a—

Q: A license.

A: Yes.

Q: And he knew that you didn't have one?

A: Yes.

Q: But he let you use the moped anyway?

A: Yes.

Q: Did he also know that you guys were underage to use a moped?

A: Yes.

. . . .

Q: Now, you testified that Shawn Toyozaki told you to drive the moped and operate it like you had a license; is that right?

A: Yes.

Q: And what he meant by that was that in case you ever got stopped by the police, what were you supposed to do?

A: Just give 'em the name of the—name of the person who owns the moped and the reason why you were using it.

Q: He told you what to say to the policeman if you got stopped?

A: Yes.

Q: So he told you that if you got stopped by a policeman, to give him the owner of the moped, which was Shawn Toyozaki?

A: Yes.

Q: And to also tell him the reason you were using it?

A: Yes.

Q: What did he tell you to tell the officer as to the reason you were using it?

A: Use it for the routes.

Q: For the newspapers?

A: Yes.

Q: Did you ever get stopped by the police?

A: A couple of times.

Q: What happened? When did this happen?

A: The first time was on King Street[, w]hen I was leaving the company.

Q: When you say leaving the company, leaving the Star-Bulletin building on Kapiolani Boulevard?

A: Yes. I was going on King Street, and he pulled me over. He asked if I had a license. I said no. He said who is this bike registered under. I said Shawn Toyozaki. And the cop asked where does this guy work. I sa[id] he's the manager for Star–Bulletin. And he says why are you using it. I sa[id] for the routes.

And then they contacted Shawn Toyozaki to come pick us up. The officer said he didn't want us using it, in case something happens. So Shawn came[,] picked us up, put the mopeds in the van.

And then we went down Kapahulu. Because Shawn Toyozaki knew that the cop couldn't come down that side. So ... I guess he knew where the district ends for the cops. We went down Kapahulu where my route is and I started delivering.

Q: On the moped?

A: Yes.

Q: What did the officer tell Shawn Toyozaki about you guys using the moped?

A: That we shouldn't be using it.

Q: Because you had no license?

A: Yes.

Q: And you were also under age?

A: At that time, I was 15.

Q: But you shouldn't be using it because you had no license?

A: Yes.

Q: And this, again, was before Shawn ... Potter's accident[?]

A: Yes.

(Some ellipsis points added and some in original.)

On the day of his accident, Potter used one of Toyozaki's mopeds to do his home deliveries. Afterward, he met with Toyozaki and some other newspaper carriers for dinner. Potter left Toyozaki's home with another carrier in order to get the muffler on one of the mopeds fixed. Unable to find the friend who was to do the repair, the boys proceeded to the home of another friend and socialized until shortly after 10:00 p.m. They were en route to Toyozaki's home when the accident occurred.

Toyozaki arrived at the scene shortly after the accident. The next morning, Toyozaki reported the accident to Bert Murao, his immediate supervisor at the HNA. However, the HNA did not file a report of the accident with the Director at that time.

On March 24, 1993, Potter filed a tort action against the HNA, Toyozaki, the driver of the automobile that struck him, and the driver's parents. Seven months later, on October 29, 1993, the HNA filed a "WC–1 Employer's Report of Industrial Injury" with the Director. In its report, the HNA claimed that Potter was an "employee" of the HNA and a "claimant" for workers' compensation benefits.

Potter's parents informed the Director that they did not authorize or consent to the filing of a workers' compensation claim on their son's behalf, that they did not wish to pursue a claim for workers' compensation benefits on his behalf, and that they withdrew the claim for benefits filed by the HNA and requested that the case be closed. Accordingly, on November 24, 1993, the Director denied the "claim."

Thereafter, the HNA filed a request for reconsideration of the Director's decision and/or, in the alternative, a notice of appeal. When the request for reconsideration was denied, the appeal was forwarded to the LIRAB. In his pretrial statement, Potter requested that the Director's decision be affirmed and pointed out that he (1) was not an employee of the HNA, (2) had not been delivering newspapers at the time of the accident (and, presumably, was therefore not within the course and scope of his employment, even if he was somehow deemed to be an employee of the HNA), and (3) had not filed a claim for workers' compensation benefits. He attached a copy of the complaint in his lawsuit to his pretrial statement, showing that the HNA was a defendant in that action and had initiated the claim for workers' compensation benefits only after it had been filed. Potter also supported his position with records from a 1982 claim in which a twelve-year-old newspaper carrier, who was struck by a car while making his deliveries, sought workers' compensation benefits only to have the HNA deny that he was an employee.

The HNA, for its part, minced no words in making clear that it was seeking a defense in the tort lawsuit. In a letter to the Chairman of the LIRAB, its counsel stated:

> On behalf of our clients, we ask that the Appeals Board schedule an Initial Conference in this claim at the earliest possible time.... A third-party claim has been filed by Claimant–Appellee Potter against our clients and we believe it is imperative that the Department of Labor, through the Labor and Industrial Relations Appeals Board, act on this matter as soon as possible.

The parties stipulated (1) that the issue to be decided by the LIRAB was whether Potter was an employee of the HNA and (2) that, in the event the LIRAB were to determine that Potter was an HNA employee, his accident occurred within the course and scope of Potter's employment, for purposes of the application of HRS ch. 386.

On August 1, 1997, the LIRAB entered its decision and order, which vacated the Director's decision and included the following relevant findings of fact (FOFs) and conclusions of law (COLs):

### FINDINGS OF FACT

1. HNA is in the business of selling and distributing newspapers. Claimant, a newspaper carrier, was a 14 year old minor on November 21, 1992.

2. Prior to November 21, 1992, Claimant, with the consent of his parents, signed on three occasions, the last being on November 11, 1992, a "Statement of Intention" form prepared by HNA. In the "Statement of Intention," Claimant and HNA agreed that the former would "operate [his] own retail distribution and delivery business as an independent contractor" and distribute and deliver HNA's newspapers to customers on his route.

3. HNA referred to the newspaper carriers as "little merchants" and advised them and their parents that they are independent business persons and not employees of HNA.

4. As a newspaper carrier, Claimant purchased newspapers from HNA at a lower wholesale price and then sold and delivered them to their customers at a higher retail price. The difference was Claimant's income or "profit." HNA did not pay Claimant an hourly wage or monthly salary.

5. Shawn Toyozaki ("Toyozaki") was employed by HNA as a district manager for the Kahala/Kapahulu district. As a district manager, Toyozaki transported newspapers from HNA's facility to his district for distribution to the newspaper carriers. Upon receipt of the newspapers, the newspaper carriers would deliver them to the customers on their routes within that district. Claimant was one of Toyozaki's newspaper carriers who delivered newspapers within his district.

6. HNA, through Toyozaki, assigned routes to Claimant and all other newspaper carriers within the district. Newspaper carriers, including Claimant, may not change routes without Toyozaki's permission. HNA, through Toyozaki, trained newspaper carriers and directed the manner in which the newspapers are to be delivered to the homes on the route. HNA identified for the newspaper carriers which homes on their routes preferred delivery on the porch, at the door, or in the mailbox. HNA, through Toyozaki, dictated the time within which the newspapers must be delivered by the newspaper carriers.

7. On November 21, 1992, at or around 10:30 p.m., Claimant was injured in a collision between the moped he was operating and a vehicle driven by a third party....

8. HNA, through Toyozaki, had provided Claimant with a moped to deliver newspapers on his route. The moped that Claimant was operating at the time of the accident was the one that HNA had provided to him to deliver newspapers.

....

11. On March 24, 1993, Claimant, through his attorney, filed a civil tort action against HNA....

12. On October 29, 1993, seven months after the filing of the civil suit, HNA filed a WC-1 report of industrial injury with the Disability Compensation Division. The

WC–1 report stated that Claimant suffered an injury in a motor vehicle accident on November 21, 1992. HNA accepted liability for claimant's November 21, 1992 injury.

. . . .

14. On November 18, 1993, Claimant, through his legal counsel, advised the Disability Compensation Division that he declines any workers' compensation benefits. It was Claimant's intention to seek compensation in tort against HNA and others.

15. By decision dated November 24, 1993, the Director denied compensation to Claimant without a hearing on the basis that Claimant did not wish to pursue a claim for workers' compensation benefits.

16. There is no evidence that HNA wilfully caused Claimant to believe that he would not be entitled to workers' compensation benefits and could only seek judicial relief for injuries related to his work. There is also no evidence that HNA ever took the position that Claimant was not covered by or entitled to benefits under Chapter 386.

## CONCLUSIONS OF LAW

### A. Contract of Hire

. . . .

Under HRS § 386–1, employee means any individual in the employment of another person. Employment "means any service performed by an individual for another person under any contract of hire or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully entered into." HRS § 386–1.

The Hawaii Supreme Court has held that a "contract which sets forth the place, weekly hours, and duration of the employee's employment as well as the wages he will be paid while working" satisfies the requirements of a contract of hire within the meaning of the workers' compensation law. *Evanson v. Univ. of Hawaii*, 52 Haw. 595, 599 [483 P.2d 187] (1971).

The fact that Claimant and HNA may have entered into an independent contractor agreement and agreed not to label their relationship as one of employment does not mean that there was no contract of hire or no employment relationship.

In *Locations, Incorporated v. Hawai'i Dept. of Lab. and Indus. Rel.*, 79 Hawai'i 208, 211 [900 P.2d 784] (1995), the Hawaii Supreme Court stated that although a relationship may be based on an independent contractor agreement, the existence of an independent contractor agreement, standing alone, would not exempt an employer from the requirements of Chapter 386. The Court "recognized that an employment relationship may exist even in situations in which the parties have 'agreed' not to label themselves as employer and employee." *Id.*

Based upon the applicable caselaw [sic], the definitions of employee and employment in HRS § 386–1, and the facts before us, we conclude that the work arrangement between Claimant and HNA wherein Claimant agreed to purchase newspapers at wholesale price, sell them to customers at retail, with Claimant pocketing the difference as his "profit", and deliver them on an assigned route at a time and in the manner specified by Toyozaki or HNA, meets the necessary requirements of a contract of hire.

### B. Legality of Contract of Hire

. . . .

Unless Claimant was hired to work in an illegal or criminal enterprise or occupation, his status as an employee does not cease even though the employment may have been unlawful. 1 *Modern Workers' Compensation*, § 106:3 (Canavan ed.1993)[.] Consequently, an employee is still an employee even though "he or she is paid less than the minimum wage and therefore is illegally employed, or works in violation of any law regulating wages and hours, or works in violation of Sunday laws, or works without a required license, permit, or certificate, or works for a public employers in violation of civil service or other hiring law or regulation." *Id.*

In this case, Claimant was hired to sell and deliver newspapers. Claimant does not allege and there is no evidence that the sale and delivery of newspapers is an ille-

gal activity or occupation. Accordingly, we conclude that Claimant's contract of hire with HNA is not void or voidable.

### C. Control vs. Consent

Claimant contends that in a situation where the injured person had entered into an independent contractor agreement and disavowed any rights he or she may have had under Chapter 386, consent to employment, and not control, should be the test to determine whether there was an employment relationship. And since Claimant did not consent to an employment relationship in this case, Claimant concludes that there was no employment relationship. In support, Claimant cites to *Kepa v. Hawaii Welding Co., Ltd.*, 56 Haw. 544, 551 [545 P.2d 687] (1976).

In *Locations, supra*, the Hawaii Supreme Court explicitly stated that the test for determining the existence of an employment relationship for purposes of workers' compensation is the degree of control exercised by the person in whose behalf the work is done. Since the Court made no exceptions, we conclude that the control test must be applied in all cases whether the injured worker seeks workers' compensation coverage or not.

As for *Kepa*, we do not consider it persuasive authority. In *Kepa*, the Hawaii Supreme Court, quoting from 1A Larson, *Workmen's Compensation Law*, § 48.10 (1973), stated that an employment relationship "must be entered into in a deliberate manner with the informed consent of both parties." The issue in *Kepa* was whether a lending employer had transferred control over the lent employee to a borrowing employer so that the lending employer is relieved of its workers' compensation liability. Likewise, § 48.10 to Larson's *Workmen's Compensation Law*, refers to a lent employee or dual employment situation. It was Professor Larson's opinion that consent was a factor in determining whether an employee, who was loaned out by the lending employer, had entered into a separate contract of hire with the borrowing or "special" employer.

We find *Kepa* and § 48.10 inapposite since the quoted statement was made in the context of a lent employee or a dual employment situation.

We, therefore, conclude that the control test must be applied in this case to determine whether an employment relationship existed between HNA and Claimant. In this case, HNA, through Toyozaki, assigned a route to Claimant and dictated the time, method, and manner in which the newspapers are sold or delivered to its customers. Applying the control test, we conclude that the level of control exerted by HNA over the method and details of Claimant's work was sufficient to create an employer-employee relationship.

### D. Estoppel

. . . .

### 1.

The theory of equitable estoppel requires proof that one person wilfully caused another person to erroneously believe a certain state of things, and that person reasonably relied on this erroneous belief to his or her detriment. *Maria v. Freitas*, 73 Haw. 266, 273 [832 P.2d 259] (1992). Claimant contends that he detrimentally relied on HNA's classification of his status as independent contractor; as a result, he did not make a claim for workers' compensation benefits and, instead, incurred time and expense to bring a civil lawsuit to recover damages for his injuries. We disagree.

While HNA may have labeled Claimant as an independent contractor, we have found no evidence that HNA wilfully caused Claimant to believe that he would not be entitled to workers' compensation benefits and could only seek judicial relief for injuries relating to his work. There is also no evidence of reasonable reliance. Our review of the record indicates that Claimant, who was represented by an attorney, chose to seek relief in court, rather than under Chapter 386.

### 2.

A species of equitable estoppel, the principle of quasi estoppel[,] precludes a party from asserting to another's disadvantage, a right inconsistent with a position previously taken. *Maria v. Freitas, supra* at 274 [832 P.2d 259]. . . .

In this case, HNA never took the position that Claimant was not covered by or entitled to benefits under Chapter 386 because he was an independent contractor. The fact that HNA may have labeled Claimant as an independent contractor is not sufficient for us to apply quasi estoppel in this case.

Accordingly, we conclude that Claimant was an employee of HNA on the date of his injury.

On August 27, 1997, Potter filed a motion to reopen and/or for clarification of the LIRAB's decision. In support of the motion, Potter argued that the jurisdiction of the LIRAB was limited to those circumstances wherein a claim for workers' compensation benefits had been made and that, inasmuch as he had not made such a claim, the LIRAB's decision had been purely declaratory in nature and amounted to a ruling that, *should* Potter file a claim for workers' compensation benefits, even though he signed an independent contractor agreement, he would be considered an employee. Upon payment of such benefits by the HNA, Potter conceded, the HNA would be entitled to the tort defense afforded by HRS § 386-5 (1993).[1] However, Potter reasoned, inasmuch as the HNA had *elected* to contract with Potter as an independent contractor, it chose not to come under HRS ch. 386, and, therefore, it was without standing to invoke the jurisdiction of either the Director or the LIRAB, in the absence of a claim for benefits by Potter and in order merely to obtain a ruling that it was entitled to an HRS § 386-5 defense.

On December 17, 1997, a divided LIRAB denied Potter's motion to reopen and/or for clarification. A dissenting member of the Board opined:

The Board, at this juncture, does not have jurisdiction to render an opinion or decision in this particular case.

Jurisdiction in a worker's compensation case vests upon the director only when a claim for benefits is filed by an employee. In the absence of such claim, the director may not, *motu proprio*, initiate an investigation and render a decision. If the director does not have jurisdiction to render a ruling or decision, neither does the Board.

As Section 386-86, *Hawaii Revised Statutes,* provides *inter alia:*

If a claim for compensation is made, the director shall make such further investigation as deemed necessary *and render a decision* within sixty days after the conclusion of the hearing awarding or denying compensation, stating the findings of fact and conclusions of law. (Emphasis added[.] )

Obviously, the filing of a claim is a condition precedent before the director can initiate the necessary investigation and render a decision in a compensation case. Here, no such claim for compensation has ever been filed. *See also Leinaala G. Kekauoha v. Sears, Roebuck and Company,* Case No. AB 90–26(M) (7–89–06232).

I note that Claimant–Appellee has elected to file a tort action in the Circuit Court. As such, the Employer–Appellant's recourse should have been exercised in, and determined by, that court. I do not believe that Employer–Appellant should be allowed to shield itself from the pending tort action by utilizing the mechanism of the workers' compensation law regardless of the nature of the case.

---

1. HRS § 386-5 provides:

 **Exclusiveness of right to compensation; exceptions.** The rights and remedies herein granted to an employee or the employee's dependents on account of a work injury suffered by the employee shall exclude all other liability of the employer to the employee, the employee's legal representa-
 tive, spouse, dependents, next of kin, or anyone else entitled to recover damages from the employer, at common law or otherwise, on account of the injury, except for sexual harassment or sexual assault and infliction of emotional distress or invasion of privacy related thereto, in which case a civil action may also be brought.

Potter's timely appeal to this court followed.

## II STANDARDS OF REVIEW

### A. Interpretation Of A Statute

 "[T]he interpretation of a statute ... is a question of law reviewable *de novo.*" *State v. Arceo,* 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (quoting *State v. Camara,* 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura,* 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995); *State v. Higa,* 79 Hawai'i 1, 3, 897 P.2d 928, 930, *reconsideration denied,* 79 Hawai'i 341, 902 P.2d 976 (1995); *State v. Nakata,* 76 Hawai'i 360, 365, 878 P.2d 699, 704, *reconsideration denied,* 76 Hawai'i 453, 879 P.2d 558 (1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

*Gray v. Administrative Director of the Court,* 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto,* 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997). Furthermore, our statutory construction is guided by established rules:

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.
>
> When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists....
>
> In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One ave-

nue is the use of legislative history as an interpretive tool.

*Gray,* 84 Hawai'i at 148, 931 P.2d at 590 (quoting *State v. Toyomura,* 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1–15(2) (1993). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*Ho v. Leftwich,* 88 Hawai'i 251, 256–57, 965 P.2d 793, 798–99 (1998) (quoting *Korean Buddhist Dae Won Sa Temple v. Sullivan,* 87 Hawai'i 217, 229–30, 953 P.2d 1315, 1327–28 (1998)).

### B. Review Of An Agency Decision

 Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) [ (1993) ] to the agency's decision. This court's review is further qualified by the principle that the agency's decision carries a presumption of validity and appellant has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences.

*Bragg v. State Farm Mutual Auto. Ins.,* 81 Hawai'i 302, 304, 916 P.2d 1203, 1205 (1996) (quoting *University of Hawai'i Professional Assembly v. Tomasu,* 79 Hawai'i 154, 157, 900 P.2d 161, 164 (1995)). HRS § 91–14(g) provides:

> Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the ad-

ministrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91–14(g) (1993). "Under HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection (6)." *Bragg*, 81 Hawai‘i at 305, 916 P.2d at 1206.

*Korean Buddhist Dae Won Sa Temple*, 87 Hawai‘i at 229, 953 P.2d at 1327 (quoting *Konno v. County of Hawai‘i*, 85 Hawai‘i 61, 77, 937 P.2d 397, 413 (1997)).

## III. *DISCUSSION*

A. *The "WC–1 Employer's Report Of Industrial Injury" Filed By The HNA Cannot Be Construed As A Claim For Benefits Filed On Potter's Behalf.*

█ HRS § 386–82 (1993) provides in pertinent part that a "claim may be made by the injured employee or the employee's dependents or by some other person on the employee's behalf." In *In re Cowan*, 32 Haw. 928 (1933), this court construed the statute to mean that claims made on behalf of a minor must be made by "a 'guardian' or 'next friend' *duly empowered to act for the minor*." *Id.* at 935 (emphasis added).

Therefore, even assuming that the HNA's "WC–1 Employer's Report of Industrial Injury," which ostensibly—albeit belatedly by many months—was filed pursuant to the requirements of HRS § 386–95 (1993),[2] could be construed as a "claim" for benefits, the record contains no evidence that HNA had been "duly empowered to act" on Potter's behalf as required by this court's holding in *Cowan.*

█ Moreover, the HNA's argument that the filing of its "WC–1" could constitute a claim for workers' compensation benefits on Potter's behalf is disingenuous because it is inconsistent with the administrative scheme established by HRS ch. 386. HRS § 386–82 provides for a two-year period within which an employee must file a claim or be barred from doing so. Had the legislature intended the filing of the employer's report—which must be completed within seven working days of the time the employer first learns of the injury pursuant to HRS § 386–95, *see supra* note 2—to constitute the filing of an injured employee's claim for benefits, the two-year filing period established by HRS § 386–82 would be surplusage and a nullity. Our rules of statutory construction require us to reject an interpretation of statute that renders any part of the statutory language a nullity. *See State v. Jumila*, 87 Hawai‘i 1, 10, 950 P.2d 1201, 1210 (1998); *Shultz v. Lujan*, 86 Hawai‘i 137, 141, 948 P.2d 558, 562 (1997); *Konno v. County of Hawai‘i*, 85 Hawai‘i 61, 71, 937 P.2d 397, 401 (1997). Accordingly, we hold that no lawful claim for workers' compensation benefits was filed with the Director in the instant matter.

B. *In The Absence Of A Lawful Claim, The Director Had No Authority Either To Award Or To Deny Benefits To Potter.*

█ HRS § 386–86 (1993) provides in relevant part that "*[i]f a claim for compen-*

2. HRS § 386–95 provides in pertinent part:

Within seven working days after the employer has knowledge of such injury causing absence from work for one day or more or requiring medical treatment beyond ordinary first aid, the employer shall make a report thereon to the director. The report shall set forth the name, address, and nature of the employer's business and the name, age, sex, wages, and occupation of the injured employee and shall state the date and hour of the accident, if the injury is produced thereby, the nature and cause of the injury, and such other information as the director may require.

. . . .

Any employer who wilfully refuses or neglects to make any of the reports or give notice required by this section shall be fined by the director not more than $5,000.

*sation is made,* the director shall make such further investigation as deemed necessary and render a decision within sixty days after the conclusion of the hearing awarding. or denying compensation...." (Emphasis added.) The plain language of the statute establishes that "a claim for compensation" is a precondition of an order awarding or denying workers' compensation benefits. In the absence of a lawful claim, the Director lacked the statutory authority either to award or to deny benefits to Potter.

■ Unquestionably, the Director may issue *declaratory* rulings concerning whether, in a specific set of circumstances, a claimant would be entitled to workers' compensation benefits *upon the bringing of a lawful claim. See Locations, Inc. v. Hawai'i Dept. of Labor,* 79 Hawai'i 208, 900 P.2d 784 (1995). However, on the record before us, the determination that Potter would have been entitled to workers' compensation benefits had he chosen to file a claim is a far cry from a determination by the Director that the HNA may benefit from the HRS § 386–5 tort defense in an unrelated civil action.

C. *By Electing To Contract With Potter As An "Independent Contractor" Through The Use Of A Contract Of Adhesion Prepared By Its Representatives, The HNA Gave Notice Of Its Intention To Opt Out Of The Protections Afforded It By HRS § 386–5.*

It is apparent to us that the LIRAB's ruling on the HNA's appeal in the instant matter was based on a misapprehension of HRS ch. 386 and our precedents. The HNA urges that this court's decision in *Locations* compels affirmance of the LIRAB's favorable ruling. However, the present case is factually distinguishable from *Locations.* In that matter, a real estate sales company petitioned the Department of Labor and Industrial Relations (DLIR) for a ruling that licensed real estate agents who performed sales activities pursuant to an "independent contractor agreement" were not employees, and, therefore, need not be afforded workers' compensation coverage. 79 Hawai'i at 209, 900 P.2d at 785. This court held that the "control test" was the proper measure for determining whether an employer-employee relationship existed for purposes of the workers' compensation laws; after applying the control test, we further held that the real estate agents were independent contractors, unentitled to workers' compensation coverage. To that end, we observed in *Locations:*

For purposes of coverage, HRS chapter 386, pertains only to "employees" who are "individual[s] in the employment of another person." HRS § 386–1 (1985). With respect to independent contractors, this court has held that *a party who hires an independent contractor is not an employer, and thus, "does not fall within the provisions of HRS § 386–5 which exempts employers from liability to their employees." Makaneole v. Gampon,* 70 Haw. 501, 508, 777 P.2d 1183, 1187 (1989). It therefore follows that a party who contracts with an independent contractor need not provide workers' compensation coverage for that independent contractor.

The DLIR has observed that:

Work[ers'] compensation laws are highly *remedial* in character. Their paramount purpose is to provide compensation for an employee for all work-connected injuries, regardless of questions of negligence and proximate cause. Courts should therefore give them a liberal construction in order to accomplish their beneficent purposes.

*Evanson v. University of Hawai'i,* 52 Haw. 595, 600, 483 P.2d 187, 191 (1971) (citations omitted). Consequently, the DLIR contends that "the term 'employee[,]' as used in the workers' compensation context, should be liberally construed to achieve the beneficent intent of workers' compensation statutes." Although, Locations does not dispute this contention, and although we recognize the beneficent purposes and the remedial nature of Hawai[ ]i's workers' compensation laws, "[t]he rule of liberal construction cannot be strained to the point of extending it to employments not within its scope or intent." *Florida Indus. Comm'n v. Schoenberg,* 117 So.2d 538, 541 (Fla.Dist.Ct.App. 1960). *Simply stated, there can be no workers' compensation coverage absent an*

*employer and employee relationship. See Harter v. County of Hawai'i,* 63 Haw. 374, 378 n. 3, 628 P.2d 629, 632 n. 3 (1981) (the relationship between employer and employee *must be entered into in a deliberate manner with the informed consent of both parties* ).

*Id.* at 211, 900 P.2d at 787 (emphases added).

Nevertheless, the Hawai'i appellate courts have traditionally been reluctant to allow an employer to achieve inequitable results by resorting in form to an independent contractor agreement in order to mask the reality of an employer-employee relationship and, thereby, deprive workers of statutory protections to which they are lawfully entitled. *See Homes Conssultant Co., Inc. v. Agsalud,* 2 Haw.App. 421, 633 P.2d 564 (1981) (holding that home improvement company's sales persons, who were paid on commission, were employees, so as to make employer liable for payment of employment security taxation); *In re Appeal of Century Metalcraft Corp.,* 41 Haw. 508 (1957) (holding that salesmen, designated as "distributors" by manufacturer/retailer of aluminum cookware, were employees for purposes of employment security taxation); *Bailey's Bakery v. Borthwick,* 38 Haw. 16 (1948) (holding that bakery's denomination of its drivers as "independent contractors," where drivers owned their own trucks, which could be financed by bakery, and "purchased" bread from bakery at "wholesale" prices and resold it to retailers, retaining a "profit," did not exempt bakery from requirement to pay unemployment insurance taxes). Similarly, we are aware that "contracts for hire" are often contracts of adhesion, entered into by parties who do not possess equal bargaining power. *See Brown v. KFC National Management Co.,* 82 Hawai'i 226, 246–47, 921 P.2d 146, 166–67 (1996) (noting, under Hawai'i law, that: (1) a contract of adhesion—*i.e.,* a contract offered by the stronger of the contracting parties on a "take it or leave it" basis—is unenforceable if (a) the contract is the result of coercive bargaining strength, and (b) the contract unfairly limits the obligations and liabilities of, or provides otherwise unfair advantages to, the stronger party; and (2) an arbitration agreement in an employment application is usually not re-

garded as unenforceable because the second condition is generally lacking). The "Newspaper Dealers' Agreement" is such a contract of adhesion.

It is apparent from the record that the "Newspaper Dealers' Agreement" was offered to prospective newspaper carriers on a take-it-or-leave-it basis. The disparity of bargaining power was made more acute by the paucity of employment opportunities available to young people. Moreover, pursuant to the terms of the agreement, the HNA sought to avoid liability for employee benefits, state and federal payroll taxes, and vicarious liability for any damages that might result from the news carriers' delivery of its newspapers. The agreement offered no reciprocal benefits to the carriers. By the express terms of its own agreement, the HNA hired "independent contractors."

Accordingly, because the HNA itself chose to construe the relationship in the foregoing manner, pursuant to this court's decisions in *Locations* and *Makaneole,* we hold that it is estopped from claiming the protections of the HRS § 386–5 tort defense in actions involving the carriers unless and until the injured carrier challenges the form-over-substance nature of the agreement and is awarded workers' compensation benefits by the Director or the LIRAB. Only upon payment of such benefits would the HNA then be entitled to seek the protection of HRS § 386–5 as a defense to a tort lawsuit. Any other result would allow the HNA to reap the rewards of its own duplicity in dealing with underage workers who were ripe for exploitation. Moreover, this result both protects the principle, enunciated in *Locations* and *Harter,* that an employer-employee relationship must be entered into in a deliberate manner with the informed consent of both parties and maintains the integrity of the social bargain that lies at the heart of the workers' compensation system, wherein a worker surrenders his "right to recover common law damages from the employer in exchange for the certainty of a statutory award for all work-connected injuries." *Evanson,*

52 Haw. 595, 598, 483 P.2d 187, 190 (1971).[3]

In arguing to the contrary, the HNA contends that

[t]his appeal poses the issue whether a member of only one of the groups intended to be benefitted by the workers' compensation statute, i.e., the workers, has the right to opt out of the socially enforced bargain and to ignore the procedures of the Director and the Board because the worker prefers to prosecute a tort remedy against the employer.

The HNA further expresses its concern that

[i]f Potter's argument were to be sustained, Chapter 386 would become an elective remedy, rather than a socially enforced bargain imposed by statute. An injured worker who preferred to risk his medical benefits and financial future by seeking recompense from his employer in the tort system could void the "exclusivity" provision by the simple expedient of failing to request workers' compensation benefits. If the only interests advanced by the workers' compensation scheme were the worker's, perhaps this chancy election by the worker might be allowable. However, the beneficiaries of the socially enforced bargain include the worker's dependents, employer, health care insurer, the judiciary, and society as a whole. Ill-advised worker bets on the outcome of a tort suit can result in the disability, poverty and public dependency of the worker and his family. The goal of developing a specialized agency with expertise in the area of industrial accidents would be undermined. The workload of the courts would increase. Workers could be expected to elect statutory benefits when their tort recovery prospects looked unfavorable, and not to file benefit claims when the statutory scheme worked to the advantage of their employer, thereby undercutting the employer's side of the social bargain. The idea that the jurisdiction of the Director and the provisions of the workers' compensation laws are subject to nullification by the worker makes no more sense than the notion that each citizen can select which laws pertain to him or her.

■ Our holding, limited as it is to the circumstances of the present record, does not open the door to the possibilities that the HNA suggests. We are not providing a mechanism whereby any worker, who has consistently been labeled and treated by his employer as an "employee" and afforded the full panoply of protections and benefits that customarily accompany that status, may "opt out" of the workers' compensation statutes. Rather, we are merely restricting the prerogative of employers to "have their cake and eat it too." When an employer *expressly* contracts with a worker as an "independent contractor," the employer will be bound by his election. If such a worker is injured on the job, the individual may then choose to (1) seek relief in tort or (2) attempt to show that the independent contractor agreement was a sham and that the worker is, therefore, entitled to workers' compensation benefits.[4]

3. On the other hand, nothing in this opinion is intended, in itself, to foreclose an employer's access to declaratory relief, pursuant to HRS ch. 632 (1993).

4. While the HNA's stirring defense of the social welfare protected by the workers' compensation statutes is inspiring, we feel constrained to observe in passing that, *were* Potter an employee of HNA, it appears that, in the course of his employment, the following statutes were violated: (1) HRS § 291C–194 (1993), which provides in relevant part that "[n]o person shall drive a moped unless the person . . . [p]ossesses a valid driver's license"; (2) HRS § 291C–195 (1993), which provides in relevant part that "[n]o person less than fifteen years of age shall drive a moped"; (3) HRS § 286–133 (1993), which provides that "[n]o person shall authorize or knowingly permit a motor vehicle or moped owned by that person or under that person's control to be driven upon any highway by any person who is not authorized under law to drive the motor vehicle or moped"; (4) HRS § 286–134 (1993), which provides that "[n]o person shall employ as a driver of a certain category of a motor vehicle any person not licensed under this part to operate that category of motor vehicle"; (5) HRS § 386–95, which provides in relevant part that "[w]ithin seven working days after the employer has knowledge of [an on-the-job] injury causing absence from work for one day or more or requiring medical treatment beyond ordinary first aid, the employer shall make a report thereon to the director"; and (6) HRS § 707–714 (1993), which provides in relevant part that "[a] person commits the offense of reckless endangering in the second degree if the person engages in conduct which recklessly places another person in danger of death or serious bodily injury." Title

## IV. CONCLUSION

For the reasons set forth above, we re-verse the decision of the LIRAB.

12, Department of Labor and Industrial Relations Rules, ch. 25, subchapter 4, declares that the operation of a motor vehicle by a minor is a hazardous occupation. However, HRS § 390–5 (1993) expressly exempts "minor[s] employed ... [i]n performance of work in connection with the sale or distribution of newspapers" from the general prohibition, set forth in HRS § 390–2 (1993), of the employment of minors in "any gainful occupation ... which has been declared ... hazardous for the minor."